DISTRIGAS OF MASSACHUSETTS
CORPORATION, Plaintiff,
Appellant,

v.

BOSTON GAS COMPANY,
Defendant, Appellee.

DISTRIGAS OF MASSACHUSETTS
CORPORATION, Plaintiff,
Appellee,

v.

BOSTON GAS COMPANY,
Defendant, Appellant.

Nos. 82–1398, 82–1433.

United States Court of Appeals,
First Circuit.

Argued Oct. 7, 1982.

Decided Nov. 22, 1982.

Memorandum and Order March 1, 1983.

Harold Hestnes, with whom Harry L. Manion, III, Paul F. Saba, and Hale & Dorr, Boston, Mass., were on brief, for Distrigas of Massachusetts Corp.

Stephen B. Deutsch, with whom Stephen P. Burgay, Foley, Hoag & Eliot, L. William Law, Jr., Boston, Mass., and Boston Gas Co. were on brief, for Boston Gas Co.

Before PECK,* Senior Circuit Judge, CAMPBELL and BREYER, Circuit Judges.

* Of the Sixth Circuit, sitting by designation.

BREYER, Circuit Judge.

The parties in this case, Boston Gas Company and Distrigas of Massachusetts Corporation ("DOMAC"), have sued each other for money that each believes the other owes it under tariffs filed by DOMAC with the Federal Energy Regulatory Commission (FERC) governing DOMAC's terminalling and storage of liquified natural gas (LNG). The district court accepted Boston Gas's interpretation of the relevant tariff provisions and entered judgment with interest for Boston Gas. We believe that the doctrine of "primary jurisdiction," *United States v. Western Pacific Railroad Co.*, 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956), requires us to obtain FERC's views before deciding which party is correct.

I

We shall first set out our provisional view of the facts of this case, to clarify why the doctrine of primary jurisdiction applies and to give the parties or FERC the opportunity to clarify the factual background where appropriate. Evidently, DOMAC began selling LNG to Boston Gas and other buyers in 1971. Initially, these sales were unregulated; the relations between the parties were governed by contract, and the relevant contracts allowed Boston Gas to buy about 4.75 million MMBtu's of LNG per year and to use DOMAC's terminalling facility at Everett, Massachusetts. (An MMBtu is the amount of gas capable of providing one million British Thermal Units, a measurement of heat.) Boston Gas also bought from DOMAC the right to store between 1.1 and 1.7 million MMBtu's of LNG each month at the Everett facility. It evidently paid DOMAC for the LNG itself, for "terminalling" the LNG by off-loading the gas from tankers into the storage facilities, and for storing the gas. The storage charge apparently amounted to $0.125 per MMBtu stored per month.

Soon after the initial transactions between DOMAC and Boston Gas, FERC's predecessor agency, the Federal Power Commission (FPC), began to regulate DOMAC's sales of LNG. Consequently, in March 1976, DOMAC filed a tariff governing sales, terminalling services, and storage, with the FPC. In the view of Boston Gas, this tariff ought to have embodied the terms of the prior contractual relationship but did not. As an initial matter, it evidently did not retain Boston Gas's rights to rent storage facilities. Then, after DOMAC agreed to continue these storage rights, Boston Gas noted that the tariff seemed to require a double payment for storage. First, Boston Gas was to pay for the storage outright, in the form of a fee of $0.125 per MMBtu of storage space per month. Second, DOMAC was to charge *all* of its terminalling customers for this same storage space all over again, for its terminalling charge was based upon a "cost of service" that included the cost of providing the very storage facilities that it rented to Boston Gas.

The FPC refused to accept DOMAC's proposed tariff until this dispute was resolved. The parties resolved it in early 1977, when they entered into a "settlement" agreement. The settlement agreement kept in place DOMAC's basic terminalling charge, which amounted to $1.05 per MMBtu for the first 6.4 million MMBtu's, $0.90 per MMBtu for the next 6.4 million MMBtu's, and $0.19 per MMBtu thereafter. It also kept in place the right of Boston Gas to rent between 1.1 and 1.7 million MMBtu's of storage space per month at a charge of $0.125 per MMBtu. But it overcame the "double charging" problem by requiring DOMAC to refund to its terminalling customers the amount that DOMAC had collected for its storage service through its direct separate storage charge. Since Boston Gas rented virtually all of the available storage space but accounted for only about one-third of DOMAC's terminalling business, this amounted to DOMAC's taking Boston Gas's storage payment, giving about one-third of it back to Boston Gas, and rebating the rest of it to DOMAC's other terminalling customers proportionately. If Boston Gas rented, for example, 1 million MMBtu's of storage space per month for a year, it would pay about $1.5 million for

storage; it would receive back about $0.5 million in the form of a terminalling charge rebate and the remaining $1 million was given back to the other terminalling customers. In this way, DOMAC's apparent "error" in including its storage costs in its terminalling tariff (when it actually sold its storage service separately) was overcome.

The tariff embodying this agreement was called the "Descartes tariff," not because it contained "clear and distinct ideas," but because the ship that carried the LNG from Algeria was named after the philosopher. FERC approved the Descartes tariff on December 29, 1977.

In the meantime, DOMAC, through an affiliate, had obtained rights from the Algerians to buy a much larger amount of LNG over a period of 20 years. DOMAC, Boston Gas, and perhaps other buyers, began to negotiate terms of sale and charges for terminalling and storage under this "Long Term Program" (LTP). All agreed that the gas itself would be much more expensive. They also evidently saw no reason to continue to base the terminalling charge upon a "cost of service" that included storage costs—at least not as long as Boston Gas was paying for storage separately. Thus, DOMAC initially proposed a continuation of the same ($0.125 per MMBtu per month) separate storage charge, while reducing Boston Gas's rental rights to 1.1 million MMBtu's per month. It also proposed a terminalling charge that *not only* left out storage costs but was, *by an extra amount,* a little lower than before. This terminalling charge amounted to $1.05 for the first 6.4 million MMBtu's, $0.51 for the next 19 million MMBtu's, and $0.18 per MMBtu thereafter. We shall refer to this as the "DOMAC proposed" LTP rate.

Boston Gas, however, evidently felt that the terminalling charge should be still lower, and it bargained accordingly. The parties reached agreement upon a significantly lower rate. The agreed-upon terminalling charge was $0.60 for the first 7.5 million MMBtu's, $0.55 for the next 22.5 million MMBtu's, and $0.18 per MMBtu thereafter. We shall refer to this rate as the "agreed-upon" LTP rate, for the parties agreed to apply it to the handling of all LNG to be imported under DOMAC's long-term program.

To understand the implications of these rates, one might hypothetically apply the rates to the 14 million MMBtu's of LNG that Boston Gas would be permitted to "terminal" and the 1.1 million MMBtu's per month it would be allowed to store during the first year of the LTP. If the Descartes tariff applied, Boston Gas would pay about $13 million for terminalling and $1.6 million for storage, and it would receive back slightly more than one-third of its storage payment, or $0.6 million, through the terminalling rebate. It would therefore be out of pocket about $14 million. If the "DOMAC proposed" LTP rates applied, it would pay $1.6 million for storage and $10.6 million for terminalling, for a total out-of-pocket figure of $12.2 million. Finally, if the "agreed-upon" LTP rates applied, it would pay $1.6 million for storage and $8.1 million for terminalling, and would be out of pocket about $9.7 million.

Having agreed upon the LTP rates, the parties next had to decide on when those rates would begin to apply. Their agreement on this point is contained in Article II of their October 1977 LTP statement:

The [Terminalling Service and Storage Service] Rate schedules under DOMAC's presently effective Tariff, hereinafter referred to as the Descartes Tariff, shall remain in effect until the later of April 1, 1978, or the effective date of authorization of the Long Term Program by the Federal Energy Regulatory Commission or other appropriate governmental regulatory body, hereinafter referred to as the Commission, at which time such rate schedules shall be superseded by [Terminalling Service and Storage Service] Rate schedules under DOMAC's Long Term Tariff, as revised in accordance with this Agreement.

If the Long Term Tariff [Terminalling Service] Rate schedule becomes effective after April 1, 1978, then, solely for purposes of determining the [Terminalling

Service] rate level applicable to tenders thereafter in the Contract Year ending April 1, 1979, under the Long Term Tariff [Terminalling Service] Rate schedule, volumes tendered between April 1, 1978 and the effective date of such rate schedule shall be deemed to have been tendered under the Long Term Tariff [Terminalling Service] rate schedule.

The first paragraph says that the Descartes tariff will apply until at least April 1, 1978, the beginning of the 1978 contract year, regardless of when FERC approves the LTP. If FERC did not approve the LTP by April 1, 1978, Descartes rates would stay in effect even longer—until FERC did approve the LTP, at which point the "agreed-upon" LTP tariff would take effect. (The parties presumably felt certain that FERC would approve the LTP before the end of the contract year on April 1, 1979.) The second paragraph deals with the problem of applying a three-tier tariff that might come into effect in the middle of a contract year. It provides that if, for example, FERC were to approve the LTP on September 1, 1978, at which point Boston Gas had already taken 7 million MMBtu's, the next MMBtu would be considered the seven-million-and-first, not the very first, so that Boston Gas would enjoy the lower rate applicable to second-tier purchases under the three-tier tariff rather than the high rate applicable to first-tier (initial) purchases.

In December 1977, DOMAC filed its proposed LTP tariffs with FERC. Because the tariffs were designed to take effect before April 1, 1978, the proposal used the Descartes terminalling rates. In March, DOMAC revised these proposed tariffs, substituting its own "DOMAC proposed" terminalling rate for the Descartes rate as of April 1, 1978. FERC approved the LTP tariff on December 28, 1978. When it did so, it specifically approved the October 1977 Settlement Agreement, which contained both the low "agreed-upon" terminalling charge and Article II with its transitional arrangements.

Were these the only documents and events in this case, it would be fairly clear, given the language of Article II, that the Descartes rate was intended to apply until FERC's approval of the LTP on December 28, 1978, that the "agreed-upon" LTP rates were to apply thereafter, and that FERC approved this arrangement by approving the October Settlement Agreement. The matter is complicated, however, by the fact that DOMAC sold LTP gas to Boston Gas throughout 1978, before the LTP tariff was approved. To do so, it was required to obtain FERC authorization to resell the gas. Natural Gas Act, § 7, 15 U.S.C. § 717f(c)(1)(A). It applied for, and in April 1978 it received, temporary authority to sell the gas throughout 1978, but FERC conditioned the authority upon DOMAC's charging the rates contained in its pending proposed LTP tariff. (These rates, it should be recalled, as of April 1978 included the "*DOMAC proposed*" terminalling charge.) In granting conditional approval for LTP sales during 1978, FERC made clear that these interim rates were "subject to refund," and that the "authorization" was "without prejudice to such future orders on these matters as may be issued upon the further disposition" of DOMAC's permanent LTP tariff proposal.

As previously mentioned, FERC approved DOMAC's permanent tariff proposal on December 28, 1978. The parties apparently agree that this disposition makes clear that after December 28, 1978, the "agreed-upon" terminalling rate applies. They also agree that prior to April 1, 1978, the Descartes tariff, with its pro rata refund of the separate storage charge, applies. But they do not agree about the proper terminalling charge for the period between April 1, 1978, and December 28, 1978.

Initially, Boston Gas looked to Article II and concluded that the words "effective date of authorization of the Long Term Program by [FERC] or other appropriate governmental regulatory body" might refer to an approval we have not previously mentioned—namely, a separate approval given to DOMAC by the Economic Regulatory Administration on December 31, 1977, un-

der Section 3 of the Natural Gas Act, 15 U.S.C. § 717b, which allowed DOMAC to *import* LTP gas but not to *resell* it under Section 7, 15 U.S.C. § 717f. If so, since this approval was given effect before April 1, 1978, the low "agreed-upon" terminalling rate would have begun on April 1, 1978. Boston Gas raised this claim before FERC, which rejected it on the ground that this Section 3 approval was not the approval that Article II had in mind. FERC's position was affirmed by the District of Columbia Circuit. *See Brooklyn Union Gas Co. v. FERC,* No. 79–1483 (D.C.Cir. June 21, 1981).

Boston Gas then withheld certain payments, and this suit in federal district court ensued. There, Boston Gas for the first time took the position that the Descartes tariff indeed applied until FERC approval of the permanent LTP rates on December 28, 1978, *insofar as the rebate of the storage charge was concerned* but not insofar as the terminalling rate was concerned. It evidently feels that the "DOMAC proposed" interim terminalling charge applies between April 1, 1978 and December 28, 1978, along with the Descartes tariff's rebate provision. In other words, it believes it is entitled during the period to both the advantage of the lower "DOMAC proposed" interim terminalling rate, and the storage rebate that accompanied the higher Descartes tariff rate. The district court, construing the applicable tariffs, agreed.

## II

It seems to us that there are three possible interpretations of the governing tariffs. First, Article II of the October Settlement Agreement, which became part of the permanent LTP tariff when FERC approved that tariff on December 28, 1978, may restore the entire Descartes tariff for the April-December period. FERC, in approving the October Settlement as part of the permanent LTP tariff, may have intended to restore the rates to what they would have been in the absence of its provisional or conditional resale authorizations. If so, the Descartes tariff would apply, rates, storage charge, rebate and all, until December 28, and the "agreed-upon" terminalling rate contained in the LTP tariff would apply thereafter.

Second, FERC may have read Article II to reflect the parties' intent to apply Descartes in the absence of some other agreed upon, or FERC approved, rate. That is to say, it may have assumed that its interim approval of the "DOMAC proposed" terminal rate was sufficient to make irrelevant, and ineffective, the Descartes provision of Article II. This is what DOMAC contends.

Third, FERC may have meant to restore the Descartes tariff insofar as it would bring about a lower rate than the interim tariff (by providing a storage charge refund), but to leave the interim tariff in effect insofar as it would bring about a lower rate than Descartes (by setting a lower terminalling charge). That is what Boston Gas contends. The parties, in effect, have requested the federal courts to decide which of these interpretations is correct.

## III

We intend to invoke the doctrine of "primary jurisdiction" to obtain the view of FERC before proceeding to interpret the tariffs. We do so despite the fact that neither party has directly pressed the primary jurisdiction issue before this court, although Boston Gas did raise the issue without success below. It is now well established that the doctrine is not waived by the failure of the parties to present it in the trial court or on appeal, since the doctrine exists for the proper distribution of power between judicial and administrative bodies and not for the convenience of the parties. *See Nader v. Allegheny Airlines, Inc.,* 512 F.2d 527, 542 n. 37 (D.C.Cir.1975), *rev'd on other grounds,* 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976); *Locust Cartage Co. v. Transamerican Freight Lines, Inc.,* 430 F.2d 334, 339 (1st Cir.), *cert. denied,* 400 U.S. 964, 91 S.Ct. 365, 27 L.Ed.2d 383 (1970); *Louisiana & Ark. Railway Co. v. Export Drum Co.,* 359 F.2d 311, 314 (5th Cir. 1966).

We know that "primary jurisdiction" has on occasion led courts into arcane discussions and complex doctrinal distinctions. In some instances they have spoken of "exclusive agency jurisdiction" and wrestled with the problem of whether Congress, in passing a law granting an agency certain authority, meant at the same time to remove

a court's authority to decide a similar matter. *Cf. Far East Conference v. United States,* 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576 (1952); *Texas & Pacific Railroad Co. v. Abilene Cotton Oil Co.,* 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907). In other instances, they have related the appropriateness of agency referral to certain neat regulatory categories: questions of "tariff interpretation," for example, may present legal issues calling for court decision, *see Great Northern Railway Co. v. Merchants Elevator Co.,* 259 U.S. 285, 291, 42 S.Ct. 477, 479, 66 L.Ed. 943 (1922); *World Airways, Inc. v. Northeast Airlines, Inc.,* 349 F.2d 1007, 1011 (1st Cir. 1965), *cert. denied,* 382 U.S. 984, 86 S.Ct. 561, 15 L.Ed.2d 473 (1966), while questions of tariff "reasonableness" may be properly referred initially to the agency. *See United States v. Western Pacific Railroad Co., supra.* We can avoid such distinctions here, however, simply by referring back to one basic purpose underlying the doctrine, namely that of permitting the courts "to make a workable allocation of business between themselves and the agencies," *CAB v. Modern Air Transport, Inc.,* 179 F.2d 622, 625 (2d Cir.1950); by noting that a court's need for agency views is a practical matter resisting neat categorization; and by setting forth the reasons why it is important to have the agency's views on the questions here at issue. *Cf. United States v. Western Pacific Railroad Co., supra; General American Tank Car Corp. v. El Dorado Terminal Co.,* 308 U.S. 422, 60 S.Ct. 325, 84 L.Ed. 361 (1940).

First, the meaning of the disputed language—the text of Article II—cannot be determined solely from the text itself, nor even by reference to the intent of the parties. The ultimate issue is not what those words mean in some abstract sense, but rather what FERC intended them to mean when it approved the Long Term Program. That question is obviously one as to which the agency has special insight, which would shed light on this nominally "legal" question. *See Great Northern Railway Co. v. Merchants Elevator Co.,* 259 U.S. at 292, 42 S.Ct. at 479; *cf. United States v. Western Pacific Railroad Co.,* 352 U.S. at 65–66, 77 S.Ct. at 165–166; *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic,* 400 U.S. 62, 68–69, 91 S.Ct. 203, 208–209, 27 L.Ed.2d 203 (1970) (one reason for requiring Federal Maritime Commission review of actions taken by terminal operator conference was that "the Commis-

sion approved the very agreement that established the basic pattern of this conference's operation and the scope of this same agreement was the subject of the present dispute.").

Second, there is no "obviously" correct interpretation of this tariff. Boston Gas would graft the Descartes tariff's rebate provision onto the "DOMAC proposed" basic rate. This seems inconsistent with the intent of the parties when they reached their October Settlement Agreement. For one thing, nothing in any document before us suggests that the "storage charge rebate" was meant to accompany the "DOMAC proposed" terminalling rate. To the contrary, the "storage charge rebate" reflects the fact that the Descartes tariff was based on "cost of service" figures that included storage costs; the "cost of service" figures that accompanied the "DOMAC proposed" terminalling rate do *not* (as far as we can tell) include storage costs. Moreover, DOMAC's behavior in refunding the storage charge for the first four months of 1978, when the Descartes terminalling rate was in effect under the interim tariff, but stopping the refund once the "DOMAC proposed" rate took effect under the interim tariff, is consistent with an understanding that the storage charge rebate was meant to accompany only the Descartes tariff rates.

On the other hand, even if Boston Gas's interpretation of the tariff is wrong, we are still left with a choice between the first two interpretations offered: Did Article II's approval mean to reinstate the entire Descartes tariff for April through December— *i.e.,* did Descartes supersede the "DOMAC proposed" interim rate—or did the interim rate render Article II ineffective because Article II was written to apply only in the absence of a different, provisionally approved rate? The answer to these questions is not obvious, and FERC has not had occasion to address them. FERC's expertise and rate-setting responsibility obviously would make its advice extremely useful.

Third, if the tariff were to be interpreted as Boston Gas suggests, we should have to consider whether the tariff was "reasonable" within the meaning of the Natural Gas Act. Boston Gas, or FERC, would have to explain why it would be reasonable for the April-December charge to consist of both the "DOMAC proposed" terminalling charge and the Descartes tariff's "storage

 

charge rebate." As in *Western Pacific*, when questions of tariff reasonableness are intertwined with those of tariff construction, it may be simpler to refer the entire matter to the appropriate agency for its advice rather than trying to untangle the questions.

■ The conventional practice in primary jurisdiction cases is to stay judicial proceedings and require the parties to initiate proceedings before the relevant administrative body. In the present case, however, we believe that a more efficient and expeditious alternative exists—that of requesting the agency to develop its views and then to present them through an amicus brief. *Cf.* Jaffe, *Primary Jurisdiction*, 77 Harv.L.Rev. 1037, 1047 (1964). Parties are ordinarily required to enter into full-blown administrative proceedings because only then can the agency adequately resolve the complex issues of fact and policy that underlie the usual primary jurisdiction case. In this case, however, the agency's task is only secondarily to make traditional factual findings and policy judgments; the primary question before it is simply what it meant to do when it approved the Long Term Program in December 1978. We think that this question can be answered fully and quickly through amicus participation. If more elaborate agency proceedings are required, the agency can so inform us.

We therefore shall hold this case on the docket, while instructing the clerk to send a copy of this opinion to the Solicitor General along with this court's request that FERC file an amicus brief. The parties may file responses to FERC's brief. This court will then take such further action as is appropriate.

### MEMORANDUM AND ORDER

Our previous opinion sought the help of the Federal Energy Regulatory Commission in determining which of three conflicting interpretations of the relevant tariff was correct. The first interpretation would have required Distrigas to make certain refunds to Boston Gas but would have also allowed Distrigas to obtain other, larger payments from Boston Gas. Under the second interpretation, Distrigas (DOMAC) is entitled (as the parties agree) to $199,-203.84 from Boston Gas. The third interpretation favors Boston Gas and was accepted by the district court as correct.

The Federal Energy Regulatory Commission has filed a brief stating that the second interpretation of the tariff is correct. The parties, in an action for which we highly commend them, have jointly moved "in the interest of judicial economy and efficiency" that we simply remand this case to the district court for entry of judgment in favor of Distrigas. We accept their motion and, in accordance with that motion, we vacate the district court's judgment of May 14, 1982, and remand this case to the district court with instructions to enter judgment in favor of Distrigas in the principal amount of $199,203.84, together with interest, at the rate and in the amount to which the parties will jointly stipulate, each party to bear its own costs.

*So ordered.*