## DISTRIGAS OF MASSACHUSETTS CORPORATION, Petitioner,

v.

## FEDERAL ENERGY REGULATORY COMMISSION, Respondent.

**Boston Gas Company, Brooklyn Union Gas Company and Bay State Gas Company, et al., Intervenors.**

No. 84–1307.

United States Court of Appeals, First Circuit.

Argued Sept. 7, 1984.

Decided Dec. 20, 1984.

Rehearings and Rehearing En Banc Denied Feb. 1, 1985.

Harold Hestnes, Boston, Mass., with whom Paul F. Saba, John Traficonte, Hale & Dorr, J. Alan MacKay, Boston, Mass., Sherman S. Poland, Ross, Marsh & Foster, Washington, D.C., were on brief, for petitioner.

L. William Law, Jr., Boston, Mass., with whom Jennifer L. Miller, Boston, Mass., was on brief, for Boston Gas Co., intervenor.

Michael W. Hall, Washington, D.C., with whom Gary E. Guy, Washington, D.C., and Cullen & Dykman, Brooklyn, N.Y., were on brief, for Brooklyn Union Gas Co., intervenor.

Joshua Z. Rokach, Washington, D.C., with whom William H. Satterfield, Gen. Counsel and Jerome M. Feit, Sol., Washington, D.C., were on brief, for respondent.

Before BOWNES and BREYER, Circuit Judges, and SELYA *, District Judge.

BREYER, Circuit Judge.

This case concerns the lawfulness of a refund obligation that the Federal Energy Regulatory Commission ("FERC") has im-

* Of the District of Rhode Island, sitting by desig-   nation.

posed upon a regulated natural gas utility, Distrigas of Massachusetts Corp. (also known as "DOMAC"), under § 4 of the Natural Gas Act, 15 U.S.C. § 717c. Essentially, the refund is supposed to represent the amount by which DOMAC overcharged its eleven gas distributor customers between July, 1979 (when it raised its prices above a pre-existing lawful level) and August, 1981 (when it raised its prices to a still higher level—prices FERC has considered in a separate proceeding). The parties agree that the refund is limited to the amount by which the rate increase (during this twenty-five month "locked-in" period) exceeded the pre-existing lawful rate. *FPC v. Sunray DX Oil Co.*, 391 U.S. 9, 21–25, 88 S.Ct. 1526, 1532–34, 20 L.Ed.2d 388 (1968). But they disagree about whether FERC can carve up the 25-month "locked-in" period into three separate sub-periods and calculate the refund question for each separately. Through what one might call a quirk of fate or rate, during the first of those three sub-periods the new rates brought DOMAC less revenue than the old rates would have done. FERC disregarded the first sub-period, calculated the refund on the basis of the second and third sub-periods alone, and refused to "subtract" the "first sub-period loss." DOMAC argues that FERC's "carve-up" is arbitrary, designed solely to impose a refund obligation greater in amount than the extra revenues that the "locked-in" period rates brought it while they were in effect. We agree with Distrigas that FERC has acted arbitrarily, and we hold the Commission's refund calculation unlawful.

I

We have already discussed the factual and legal background of this case in two prior opinions and we refer the interested reader to those opinions for details. *Distrigas of Massachusetts Corp. v. FERC*, 737 F.2d 1208 (1st Cir.1984); *Distrigas of Massachusetts Corp. v. Boston Gas Co.*, 693 F.2d 1113 (1st Cir.1982). Therefore, we take as given the facts that DOMAC's charges in early 1979 were those contained in a lawful, FERC-approved, tariff; that in early 1979 DOMAC sought a rate increase under Natural Gas Act § 4, 15 U.S.C. § 717c; that FERC suspended the increase for five months; that the increased rates took effect in July 1979 pending the conclusion of FERC's investigation of their lawfulness; that FERC eventually found the rates unlawfully high; and that DOMAC therefore must refund the excess charges it has collected. We must explain, however, why it is that FERC's division of the locked-in period into three parts could increase the size of DOMAC's refund obligation.

DOMAC charged prices for its liquified natural gas ("LNG") that varied, depending upon how much LNG DOMAC had already sold during its "contract year" (a twelve month period running from April 1 of one year to March 31 of the next). Thus, under its old, lawful, tariff DOMAC charged $.65 per MMBtu (gas providing one million British thermal units of heat) until it had sold 7.5 million MMBtu. It then charged $.55 per MMBtu until it had sold 23.5 million more MMBtu. It charged $.18 per MMBtu thereafter. Under its new proposed rate DOMAC charged higher first and second tier rates. It also changed the scope of first and second tier coverage (extending the scope of the first tier rate, while diminishing the scope of the second). To be more specific, DOMAC's new locked-in period rates were $1.05 per MMBtu over the first 8.1 million MMBtu; $.615 per MMBtu for the next 14 million MMBtu; and $.18 per MMBtu thereafter. Figure 1 shows the rates graphically. The rate change was to provide DOMAC with additional revenues amounting to the sum of areas A, B, and C, minus area D. When DOMAC sold 30 million MMBtu or more in a contract year, this sum would amount to about $1.3 million in additional revenues.

Although DOMAC's new rates did not take effect until July 5, 1979, DOMAC calculated the amount of gas it sold (for purposes of triggering a "rate tier" change) from April 1, 1979 (the beginning of its "contract year"). Thus, soon after the new rates took effect DOMAC dropped its rate

into the new rates' "second tier." This fact, combined with the fact that DOMAC sold more "third tier" gas than expected meant that new rates produced revenues in the 1979–1980 contract year that were about $1.5 million less than its old rates would have produced. (Graphically, the company failed to collect most of area A and "undercollected" all of area D in Figure 1.) During the rest of the locked-in period, however, (contract year 1980–81, and the first part of contract year 1981–82), the new rates earned DOMAC about $7.4 million more than its old rates would have done. Taking the locked-in period as a whole, the new rates earned DOMAC $5.9 million more. ($7.4 million less $1.5 million.) The effect of the new rates on DOMAC's revenues is illustrated by Figure 2.

As we previously stated, FERC found that the "just and reasonable" rate was lower than DOMAC's new rate. *See* Opinion No. 178, 23 FERC ¶ 61.416. In fact, it found that the "just and reasonable" rate was even lower than DOMAC's old lawful rate. It recognized, however, that DOMAC could not be required to refund more than the difference between the new rate and the old one. *FPC v. Sunray DX Oil Co.*, 391 U.S. at 24, 88 S.Ct. at 1534. Thus, it ordered DOMAC to propose refunds, noting the "[r]efunds ... for the locked-in period ... should yield revenues equal to those that would result from the [old] ... rates." 25 FERC ¶ 61,163 at 61,451. DOMAC proposed refunds totalling about $5.9 million. Two of its customers—Boston Gas Company and Brooklyn Union Gas Company—then objected, arguing that the refund should equal the entire revenues obtained in the later part of the locked-in period without any offset for the earlier deficiency. FERC agreed and ordered a refund of about $7.4 million. DOMAC challenges that decision on this appeal.

## II

We conclude that the Commission has acted unlawfully in ordering a refund that, in effect, requires DOMAC to refund more money than its rate change brought it. Our conclusion rests upon the following reasons. First, the Supreme Court has stated, and we have specifically held in the course of this proceeding, that "the pre-existing lawful rate provides a refund floor in a section 4 proceeding," *Distrigas of Massachusetts Corp. v. FERC*, 737 F.2d at 1224; *see FPC v. Sunray DX Oil Co.*, 391 U.S. at 21–25, 88 S.Ct. at 1533–34. We clearly stated that § 4's refund authority is "limited to" what § 4 describes in statutory language as the "amounts received by reason of such *increase*," namely the increase in rates for which the utility sought FERC approval under § 4. *Distrigas of Massachusetts Corp. v. FERC*, 737 F.2d at 1224. DOMAC received $5.9 million in additional revenue by reason of the "increase" over the previously lawful rate. Yet FERC ordered it to refund $7.4 million. We can find no natural way to characterize FERC's action that will square it with the language of § 4, of *Sunray*, or of our previous opinion.

Second, we find no special circumstance here that might warrant an exception from *Sunray*'s general rule. If, for example, DOMAC's locked-in rates had meant increases for some customers but decreases for others, this case would be more difficult. We should then have to decide whether the words "amounts received" in § 4 could be read to mean "amounts received from each customer." But, our reading of the record suggests that each DOMAC customer paid more during the locked-in period than it otherwise would have paid, so each is entitled to some refund. The issue is whether that customer refund shall be limited to the amount of the increase paid during the locked-in period. And, *Sunray* decided that issue.

The Commission's justification for departing from *Sunray* rests upon the fact that DOMAC's locked-in rate increase earned it less money during one of its contract years and more during two others. But what has that fact to do with the matter? DOMAC did not ask for *three* § 4 increases, one for each contract year. It asked for *one* such increase, one for the

entire locked-in period. The Commission did not consider the three periods separately, or treat them differently, when it passed upon the lawfulness of the increase. To the contrary, it initially announced that DOMAC should calculate a refund sufficient to leave it with the *"locked-in period"* revenues that its old lawful rate would have brought it. *See* Opinion No. 178, 23 FERC ¶ 61,416 (emphasis added); *see also* 25 FERC ¶ 61,163 at 61,451. Moreover, there was only one rate system and one set of rate charges; the exact same rates that produced the undercollection in 1979–80, produced the overcollection in later years. Thus, we can find no obvious substantive or administrative reason for the Commission's later decision to divide the locked-in period into three parts for refund purposes.

The only reasons given for the subdivision that we can find in the record consist of 1) the Commission's statement that DOMAC itself calculated its rates by "contract year," and 2) Boston Gas's argument to the Commission that the tripartite subdivision would mean a larger refund. The first of these reasons is not a reason; it does not explain *why* the Commission used DOMAC's contract year accounting device for refund purposes. It might appear to be a reason because on the surface it implies the existence of some administrative tradition, or history, or practical consideration that would warrant a breakdown by contract year. But, as we have indicated, we have not been able to find any such administrative consideration in this case.

The second reason suggests an effort to avoid *Sunray*. To be more specific, *Sunray* notes that § 4 proceedings focus only upon a utility's request for a rate increase. Since rate investigations often take a long time to complete, the statute compromises the interests of the utilities and its customers by automatically delaying the rate increase for one month, allowing the Commission to delay it for up to five more months, and then permitting the utility to put it into effect *subject to the Commission's power* (once the investigation is over) to insist that the utility refund any extra revenues collected. *Sunray* says

that the Commission cannot order a refund larger in amount than the extra revenues collected—even if the investigation reveals that the past lawful rate was too high. Otherwise a firm asking for an increase could end up worse off than if it had not requested one. Section 4's language prevents the larger refund, and, in doing so, it is consistent with traditional rate-making principles, which typically limit the regulator's rate-setting power to *prospective* changes. *See* Natural Gas Act, § 5, 15 U.S.C. § 717d; *FPC v. Sunray DX Oil Co.*, 391 U.S. at 24, 88 S.Ct. at 1534; *Distrigas of Massachusetts Corp. v. FERC*, 737 F.2d at 1224; *Commonwealth of Massachusetts, Department of Public Utilities v. United States*, 729 F.2d 886, 887 (1st Cir. 1984) (listing similarly structured statutes).

If the Commission can divide the "investigatory" period into sub-periods, it can easily avoid *Sunray* and § 4's limitations, because any increase in a set of complex rates is likely to mean some periods when some customers pay more and some (however brief) when they pay less. Imagine, for example, changes in a "peak-load" electricity pricing system charging customers more for daytime than nighttime use. By calculating refunds on the basis of those minutes or hours, or days, or billing periods when the customer paid more, while disregarding those when the customer paid less, the Commission could readily produce a refund obligation well in excess of the net amount that the rate "increase" yielded the utility. Could a "larger refund" argument not be used to justify any such subdivision? How, then, is the argument consistent with *Sunray*, the very purpose of which is to limit the size of the refund? *Sunray* means that Boston Gas's, or FERC's, desire to increase the size of the refund *by itself* cannot justify the subdivision. And, without the "larger refund" argument, FERC's subdivision is left without any justification whatsoever.

Third, the Commission directs us to several cases where refund offsets were denied for various reasons. These cases, however, are not on point. In *FPC v.*

*Tennessee Gas Transmission Co.*, 371 U.S. 145, 83 S.Ct. 211, 9 L.Ed.2d 199 (1962), the Court declared that a company's refund obligation to one set of customers could not be offset by its undercollections from another set of customers, *id.* at 152–53, 83 S.Ct. at 215. As we have already noted at page 22, *supra,* there is no "inter-customer offset" issue here. Moreover, *Tennessee Gas* did not involve a utility company claim that the ordered refund (without an offset) would leave it with less total revenue than its prior lawful rates would have generated. Rather, *Tennessee Gas* involved a refund that the Commission ordered the utility to pay while a Commission investigation of its rate increase was in progress. The utility argued (as to at least one set of customers) that the Commission might eventually find (by the time the Commission allocated *all* costs) that the just and reasonable rate was higher than the Commission now believed likely; that the refund would turn out not to have been required; but that the utility would be unable to get the refunded money back. The Court, in upholding the Commission's power itself to decide the merits of the utility's argument, made no mention of the statutory "rate floor." The question of a *Sunray* "refund floor" was simply not before the *Tennessee Gas* Court.

*Gillring Oil Co. v. FERC*, 566 F.2d 1323 (5th Cir.1978) is inapplicable here for similar reasons. In *Gillring,* the court upheld a FERC order requiring a utility that charged more than the "just and reasonable rate" during one period to refund the full amount of the overcharge, even though the company, during another period, charged *less* than the "just and reasonable rate." Once again, however, the utility did not claim that, if denied the offset, it would end up with less money than that guaranteed by a prior lawful rate. *Gillring* did not address the *Sunray* question, and offers no support for FERC's departure from *Sunray* here. *See also Permian Basin Area Rate Cases*, 390 U.S. 747, 826–28 & n. 121, 88 S.Ct. 1344, 1391–92 & n. 121, 20 L.Ed.2d 312 (1968) (pre-*Sunray* case denying refund offsets while expressly reserv-

ing *Sunray*-type questions that would have been presented if refunds had left utility revenues below those of "last clean rate").

FERC also cites *Belco Petroleum Corp. v. FERC*, 589 F.2d 680 (D.C.Cir.1978) for the proposition that a company may not offset a refund for charges above the "just and reasonable rate" with earlier undercollections. *Belco,* however, involved a company's attempt to offset a "loss" caused by FERC's five-month suspension of new rates with "locked-in period" refund monies. We agree that the money that a company is restrained from collecting during the suspension period may not be harvested by offsetting a subsequent refund, but that is not the issue here. DOMAC does not seek to collect revenues it could not collect during the five-month suspension period (graphically, most of Area A in Figure 1); rather, DOMAC argues that to deny use of the entire locked-in period for the calculation of the refund would be to require a refund greater than the prior lawful rate, the very rate in effect during the suspension period. *Belco* did not involve a new "just and reasonable" rate that resulted in earnings below the prior lawful rate. Therefore, the refund did not involve the rate floor and *Belco* is not applicable here. *Air Transport Association of America v. CAB*, 732 F.2d 219 (D.C.Cir. 1984) is irrelevant for the same reason. Moreover, that case arose, not under the Natural Gas Act, but under a significantly different statutory scheme. The differences between the case before us here and the cases FERC cites are set out graphically in Figure 3.

Fourth, we cannot accept FERC's claim that to allow DOMAC to take account of its 1979 revenue loss would amount to an unlawful "retroactive rate increase," *see Distrigas of Massachusetts Corp. v. FERC*, 737 F.2d at 1221, 1224. The argument begs the question. If FERC can permissibly divide the locked-in period into three parts, then to "offset" losses against gains may look like a "retroactive increase."

But if the relevant base of calculation is the entire locked-in period, there is no "retroactive increase," but only a determination of the difference between what DOMAC did receive and would have received under its prior rates. FERC's argument would not beg the question but would have independent force if FERC means that there is a "rule against retroactive rate increases" that forbids *any* offset for purposes of a refund calculation, even within a concededly appropriate period for calculating a refund. But, there is no such rule; nor could there be. Such a rule would make *Sunray* virtually meaningless for the reasons stated at p. 23, *supra.* Nor does FERC itself believe any such rule exists for FERC has itself allowed offsets *within* the "contract year"—the calculation period that it believed appropriate. (See Figure 1, illustrating internal offsets between overcollections of areas A, B and C, and undercollection of area D.)

■ In sum, the *Sunray* principle, at least in the ordinary case, means that a § 4 refund should be limited to the amount that the utility collected under its increased rates (in effect on an interim basis) and what it would have collected under its prior lawful rates. We need not decide whether, or what, circumstances might ever justify a departure from this principle, for the Commission has not justified any departure on the record here before us. For these reasons we find the Commission action arbitrary and therefore unlawful. We remand this case to the Commission for further proceedings consistent with this opinion.

*Vacated and remanded.*

## APPENDIX

Excerpts from the Natural Gas Act

1. Section 4, 15 U.S.C. § 717c.

**Rates and charges; schedules; suspension of new rates**

(a) All rates and charges made, demanded, or received by any natural-gas company for or in connection with the transportation or sale of natural gas subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges, shall be just and reasonable, and any such rate or charge that is not just and reasonable is declared to be unlawful.

. . . .

(d) Unless the Commission otherwise orders, no change shall be made by any natural-gas company in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after thirty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect. The Commission, for good cause shown, may allow changes to take effect without requiring the thirty days' notice herein provided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published.

(e) Whenever any such new schedule is filed the Commission shall have authority, either upon complaint of any State, municipality, State commission or gas distributing company, or upon its own initiative without complaint, at once, and if it so orders, without answer or formal pleading by the natural-gas company, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing and the decision thereon, the Commission, upon filing with such schedules and delivering to the natural-gas company affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect; and after full hearings, either completed before or after the rate, charge, classification, or service goes into effect, the Commission may make

**26**

such orders with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made at the expiration of the suspension period, on motion of the natural-gas company making the filing, the proposed change of rate, charge, classification, or service shall go into effect. Where increased rates or charges are thus made effective, the Commission may, by order, require the natural-gas company to furnish a bond, to be approved by the Commission, to refund any amounts ordered by the Commission, to keep accurate accounts in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts were paid, and, upon completion of the hearing and decision, to order such natural-gas company to refund, with interest, the portion of such increased rates or charges by its decision found not justified. At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the natural-gas company, and the Commission shall give to the hearing and decision of such questions preference over other questions pending before it and decide the same as speedily as possible.

FIGURE 1

**Key**

--- New Rates

*** Old Rates

⬚ Overcollections

⬚ Undercollections

PRICE
(dollars per
MMBtu )

QUANTITY
(in millions of MMBtu)

FIGURE 2

Price Schedule for Locked-In Period
(7/5/79 – 8/1/81)

FIGURE 3

## THIS CASE

New Proposed Rate — A
Prior Lawful Rate — B
Just and Reasonable Rate — C

Suspension Period — New Rate Proposed | Rate Goes In Effect | Rate Terminates

In this case, DOMAC argues that FERC's refund exceeds area 1 -- the difference between the new rate, A, and the rate floor, B -- and encompasses some of area 2.

## FERC PRECEDENT

New Rate — A
Just and Reasonable Rate — C
Prior Lawful Rate — B

FERC's precedent typically involves a commission refund amounting to area 1, and a utility effort to offset that refund by pointing to other times or other classes of customers when it charged less than the just and reasonable rate (area 2).