712 F.2d 517
 229 U.S.App.D.C. 203
 MCI TELECOMMUNICATIONS CORPORATION, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
Southern Pacific Communications Company, U.S. Telephone
Communications, Inc., National Telephone Cooperative
Association, et al., U.S. Independent Telephone Association,
American Telephone & Telegraph Company, et al., GTE Service
Corporation, et al., Western Union Telegraph Company,
National Association of Regulatory Utility Commissioners,
United States Transmission Systems, Inc., Association of
Long Distance Telephone Companies, Intervenors.
MCI TELECOMMUNICATIONS CORPORATION, Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
Southern Pacific Communications Company, U.S. Telephone
Communications, Inc., National Telephone Cooperative
Association, et al., U.S. Independent Telephone Association,
American Telephone & Telegraph Company, et al., GTE Service
Corporation, et al., Western Union Telegraph Company,
National Association of Regulatory Utility Commissioners,
Association of Long Distance Telephone Companies, Intervenors.
UNITED STATES TRANSMISSION SYSTEMS, INC., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
MCI Telecommunications Corporation, American Telephone &
Telegraph Company, et al., Southern Pacific Communications
Company, National Telephone Cooperative Association, et al.,
GTE Service Corporation, et al., Western Union Telegraph
Company, Association of Long Distance Telephone Companies,
Intervenors.
SATELLITE BUSINESS SYSTEMS, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
MCI Telecommunications Corporation, American Telephone &
Telegraph Company, et al., U.S. Transmission Systems, Inc.,
U.S. Independent Telephone Association, Western Union
Telegraph Company, National Telephone Cooperative
Association, et al., GTE Service Corporation, et al.,
Southern Pacific Communications Company, Association of Long
Distance Telephone Companies, Intervenors.
SATELLITE BUSINESS SYSTEMS, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
MCI Telecommunications Corporation, American Telephone &
Telegraph Company, et al., U.S. Independent Telephone
Association, Western Union Telegraph Company, GTE Service
Corporation, et al., Southern Pacific Communications
Company, National Telephone Cooperative Association, et al.,
Association of Long Distance Telephone Companies, Intervenors.
MCI TELECOMMUNICATIONS CORPORATION, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
National Telephone Cooperative Association, et al., GTE
Service Corporation, et al., U.S. Independent Telephone
Association, Bell Operating Companies, et al., Southern
Pacific Communications Company,
Western Union Telegraph Company, Association of Long
Distance Telephone Companies, Satellite Business Systems,
Intervenors.
BELL TELEPHONE COMPANY OF PENNSYLVANIA, et al., Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
MCI Telecommunications Corporation, Southern Pacific
Communications Company, U.S. Independent Telephone
Association, U.S. Telephone Communications, Inc., GTE
Service Corporation, et al., National Telephone Cooperative
Association, et al., Association of Long Distance Telephone
Companies, Western Union Telegraph Company, Satellite
Business Systems, Intervenors.
U.S. TELEPHONE COMMUNICATIONS, INC., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
MCI Telecommunications Corporation, GTE Service Corporation,
et al., Bell Operating Companies, et al., Southern Pacific
Communications Company, Association of Long Distance
Telephone Companies, Western Union Telegraph Company, Intervenors.
 Nos. 82-1553, 82-1554, 82-1650, 82-1657, 82-1659, 82-2194,
82-2199 and 82-2251.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued April 19, 1983.
Decided June 24, 1983.
 
 [229 U.S.App.D.C. 206] On petitions for review of orders of the Federal Communications commission.
 [229 U.S.App.D.C. 207] William J. Byrnes, Washington, D.C., with whom Michael H. Bader, Kenneth A. Cox and Joel Rothstein Wolfson, Washington, D.C., were on brief, for petitioner and intervenor, MCI Telecommunications Corp. Philip S. Nyborg and Ruth S. Baker-Battist, Washington, D.C., also entered appearances for intervenor.
 William E. Willis, New York City, with whom Margaret K. Pfeiffer, Robert B. Bell, William D. English, F. Thomas Tuttle and Kevin H. Cassidy, Washington, D.C., were on brief, for petitioner and intervenor, Satellite Business Systems. J. Laurent Scharff, W. Theodore Pierson, Jr., Richard M. Singer and Michael M. Maney, Washington, D.C., also entered appearances for petitioner.
 Leo I. George, Washington, D.C., with whom Donald J. Evans, Washington, D.C., was on brief, for petitioner and intervenor, U.S. Telephone Communications, Inc.
 David I. Shapiro, New York City, with whom Howard J. Trienens, Raymond F. Scully, Judith A. Maynes, Richard J. Cunningham, New York City, James VanR. Springer, Walter J. Walvick and Daniel Stark, Washington, D.C., were on brief, for petitioners and intervenors, Bell Operating Companies and American Telephone & Telegraph Company.
 Grant S. Lewis, John S. Kinsey, Howard A. White, Joseph J. Jacobs, New York City, and Randall B. Lowe, Washington, D.C., were on brief for petitioner and intervenor, U.S. Transmission Systems, Inc. Samuel J. Abate, Jr., New York City, also entered an appearance for petitioner.
 John E. Ingle, Deputy Asst. Gen. Counsel, F.C.C., Washington, D.C., with whom Bruce E. Fein, Gen. Counsel, Daniel M. Armstrong, Asst. Gen. Counsel, F.C.C., Jane E. Mago, Atty., F.C.C., Washington, D.C., were on brief, for respondent. Stephen A. Sharp, C. Grey Pash, Jr., Attys., F.C.C., Barry Grossman, Nancy C. Garrison, and Andrea Limmer, Attys., Dept. of Justice, Washington, D.C., also entered appearances for respondent.
 
 
 1
 J. Roger Wollenberg, William T. Lake, Roger M. Witten, Margaret L. Tobey and James M. Tobin, Washington, D.C., were on brief for intervenor, Southern Pacific Communications Co.
 
 
 2
 Thomas J. O'Reilly, Daniel J. Greenwald, III, Shelley Sternard Dempsey, Washington, D.C., were on brief for intervenor, U.S. Independent Telephone Ass'n.
 
 
 3
 Richard McKenna and James R. Hobson, Washington, D.C., were on brief for intervenors, GTE Service Corp., et al. Gail L. Polivy, Washington, D.C., also entered an appearance for intervenors.
 
 
 4
 Paul Rodgers, Charles D. Gray and Deborah A. Dupont, Washington, D.C., were on brief for intervenor, Nat. Ass'n of Regulatory Utility Com'rs.
 
 
 5
 David Cosson and Amy S. Gross, Washington, D.C., entered appearances for intervenor, Nat. Telephone Coop. Ass'n.
 
 
 6
 Ellen S. Deutsch, Washington, D.C., entered an appearance for intervenor, Organization for the Protection and Advancement of Small Telephone Companies.
 
 
 7
 Allan C. Hubbard, Reston, Va., entered an appearance for intervenor, Western Union Telegraph Co.
 
 
 8
 Victor J. Toth, Reston, Va., entered an appearance for intervenor, Ass'n of Long Distance Telephone Companies.
 
 
 9
 Before ROBINSON, Chief Judge, EDWARDS, Circuit Judge, and FAIRCHILD,* Senior Circuit Judge, United States Court of Appeals for the Seventh Circuit.
 
 
 10
 Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.
 
 HARRY T. EDWARDS, Circuit Judge:
 
 11
 The petitioners in these consolidated cases attack, from various angles, three Federal Communications Commission ("FCC" or "Commission") orders concerning interim charges paid by Other Common Carriers ("OCCs") providing interstate service for access to local telephone exchanges pending implementation of more permanent [229 U.S.App.D.C. 208] access charges beginning in January 1984. The first of the challenged orders established that the public interest would be served by continuing in effect an industry-wide agreement that had established a formula for computing the interim charges. Exchange Network Facilities for Interstate Access, 90 F.C.C.2d 6 (1982) ("Extension Order "). The second order suspended for five months and set for investigation a tariff filed by the American Telephone & Telegraph Company ("AT & T") that purported to implement the negotiated agreement because the Commission could not conclude that the tariff rates were consistent with the agreement. AT & T, 90 F.C.C.2d 202 (1982) ("Suspension Order "). The third challenged order concluded that AT & T's tariff was both inconsistent with the interim agreement and unreasonable, and required AT & T to modify the tariff in several respects. AT & T, 91 F.C.C.2d 1079 (1982) ("Order After Investigation ").
 
 
 12
 The multifarious challenges to these orders require us to determine, first, whether the FCC properly extended the industry-wide interim agreement and, if so, whether the Commission properly interpreted several disputed terms of the agreement. To resolve the first of these questions, we must decide whether (1) the Extension Order was promulgated in a timely manner, (2) the Commission properly concluded that it could extend the agreement while important questions concerning the public interest were left unresolved and deferred to an ongoing rulemaking proceeding in which those questions were being exhaustively considered, and (3) the manner in which the Commission specified the access charges for the second phase of the interim period satisfied its obligations under the agreement. We affirm the FCC's decisions on each of these disputed issues and conclude that the negotiated interim agreement was properly extended. We conclude, however, that the FCC gave inadequate consideration to the status of OCCs that had not signed the interim agreement, and that certain aspects of the Commission's decisions deserve reconsideration in light of the conclusions reached in the rulemaking proceeding to which it properly deferred when extending the agreement.
 
 
 13
 The second question is more easily resolved. We find that the Commission's disputed interpretations of the agreement are reasonable and not inconsistent with the parties' intent. We therefore reject the petitioners' challenges on this score.
 
 I. BACKGROUND
 A. Factual Background
 1. Introduction
 
 14
 As a result of FCC decisions in 1971 and 1974,[1] MCI Telecommunications Corporation ("MCI") and other OCCs obtained relatively inexpensive connections to local telephone exchange facilities for the purpose of offering point-to-point private line services and "open-ended" services using local exchange facilities at only one end of the conversation. MCI used these connections to offer a service called Execunet, which provided its customers with shared use of a large number of intercity lines that were switched on demand by computerized equipment capable of validating subscriber authorization codes and directing calls to their desired destinations. AT & T persuaded the FCC that MCI's Execunet service was in fact the equivalent of AT & T's interstate long distance Message Telecommunications Service ("MTS") and Wide Area Telecommunications Service ("WATS"). The FCC then rejected MCI's Execunet tariff on the ground that the company's MTS/WATS-type long distance service exceeded the scope of its authorization.[2]
 
 
 15
 [229 U.S.App.D.C. 209] In MCI Telecommunications Corp. v. FCC, 561 F.2d 365 (D.C.Cir.1977), cert. denied, 434 U.S. 1040, 98 S.Ct. 781, 54 L.Ed.2d 790 (1978) ("Execunet I" ), this court held that the FCC had not made the explicit public interest findings necessary to bar a carrier from using its facilities to provide any type of service. As a result, we reversed the Commission's decision. Soon thereafter, the FCC held that its outstanding interconnection orders did not require local operating companies to provide additional local exchange connections to the OCCs for the provision of MTS/WATS-type services.[3] In MCI Telecommunications Corp. v. FCC, 580 F.2d 590 (D.C.Cir.), cert. denied, 439 U.S. 980, 99 S.Ct. 566, 58 L.Ed.2d 651 (1978) ("Execunet II" ), we again rejected the Commission's reasoning and held that failure to provide additional local exchange connections to the OCCs for the provision of MTS/WATS-type services would violate the mandate of Execunet I. As a result of these decisions, local telephone companies are obligated to interconnect their exchange facilities with those of the OCCs to enable the latter to provide any services permitted by their certificates of convenience and necessity, including MTS/WATS-type services.
 
 
 16
 Our Execunet decisions, while imposing an obligation to interconnect, did not address "the compensation to which local telephone companies might be entitled for origination and termination of interstate services provided over their facilities by the specialized common carriers." Exchange Network Facilities for Interstate Access, 71 F.C.C.2d 440, 442 (1979) ("Acceptance Order" ). During the pendency of the Execunet litigation, the OCCs had been paying the local business line rates for local exchange access. But, after our decisions made clear that the OCCs could provide MTS/WATS-type services, the Bell Operating Companies filed with the FCC a new tariff seeking to offer Exchange Network Facilities for Interstate Access ("ENFIA") at rates far in excess of those charged for local business lines. This tariff, filed in May 1978, was designed to approximate the cost compensation provided by MTS and WATS pursuant to the provisions of the Separations Manual produced by the FCC and state authorities and incorporated as part of the FCC's Rules and Regulations.[4] The rates supported by this analogy[5] were vigorously challenged by the OCCs.
 
 
 17
 The maze of complex issues raised by AT & T's proposed ENFIA tariff encompassed many of the fundamental legal, economic, and policy concerns that had led the FCC to initiate a comprehensive inquiry designed, in part, to resolve issues left open by our Execunet decisions. MTS & WATS Market Structure, 67 F.C.C.2d 757 (1978) ("Docket 78-72" ). This rulemaking proceeding was intended to determine, among other things, "what reimbursement interstate services should make to local operating companies [229 U.S.App.D.C. 210] for the use of local plant" and "whether and how these charges can be equitably imposed on all interstate services." Id. at 759. To avoid time-consuming and duplicative litigation of these issues, the FCC accepted a suggestion of the Assistant Secretary of Commerce for Communications and Information urging that the Commission "undertake negotiations to arrive at some form of a 'rough justice' interim approach to the compensation local telephone companies would receive for use of their exchange facilities by OCCs for MTS/WATS 'like' services" during the period required to complete Docket 78-72. Order After Investigation, 91 F.C.C.2d at 1081.
 
 2. The ENFIA Agreement
 
 18
 Several months of public meetings under the aegis of the FCC culminated in the execution, in December 1978, of an Interim Settlement Agreement ("ENFIA Agreement"). The signatories to the agreement were MCI, Southern Pacific Communications Company ("SPCC"), United States Transmission Systems, Inc. ("USTS"),[6] and a number of telephone company parties. In the absence of congressional action defining the interconnection rights and obligations of the signatories, the interim settlement embodied in the ENFIA Agreement was to expire, by its terms, on "the effective date of a Commission Order disposing of the related issues in ... [Docket 78-72 ] or in other appropriate proceedings, and directing termination of the Agreement" or "five years from the effective date of [the] Agreement, whichever occurs first." ENFIA Agreement p 6 n.*, reprinted in 43 Fed.Reg. 59,129, 59,131 (1978). The maximum five-year term of the ENFIA Agreement was divided into two phases. Phase II, which was to govern the last two years of the agreement, would commence only if,
 
 
 19
 Prior to the end of Phase I, the FCC determines that it is reasonable and in the public interest to implement Phase II and determines an appropriate level of payment for the use of jointly used subscriber plant to be applied during that period. In the event the Commission does not make such determinations, the Agreement will terminate at the end of Phase I.
 
 
 20
 ENFIA Agreement p 11, reprinted in 43 Fed.Reg. at 59,131-32.
 
 
 21
 One of the major stumbling blocks in the negotiations preceding the ENFIA settlement was the difference between the treatment of MTS/WATS-type services and other interstate services, whose users pay only local business rates for connections to local exchange facilities. The parties explicitly recognized this discrimination and the need for prompt resolution of questions concerning the compensation of local telephone companies for use of their facilities by providers of these other interstate services. But they apparently were persuaded that the discrimination issues "need not be addressed in the present round of negotiations if doing so would foreclose immediate interim resolution of the other issues."[7] As a result, the parties reached agreement on compensation of local telephone companies for use of their exchange facilities for services within the scope of the ENFIA Agreement "as if" the charges they established "could, after appropriate consideration by the Commission, be ultimately applied to other services which also utilize the local telephone company exchange facilities." ENFIA Agreement p 5, reprinted in 43 Fed.Reg. at 59,131. But the interim nature of their compromise was clear, for the ENFIA Agreement recommended that the FCC resolve the discrimination issues in "the most [229 U.S.App.D.C. 211] expeditious proceeding possible." Id. The ENFIA Agreement is thus best characterized as one made by parties "agree[d] in principle that all carriers using local exchange facilities in the provision of their interstate services should pay for the use of the ... facilities on a nondiscriminatory basis," and designed primarily "to provide time for the Commission to conduct the proceeding(s)" necessary to resolve the discrimination questions. ENFIA Agreement p 9, reprinted in 43 Fed.Reg. at 59,131.
 
 
 22
 For the interim period, the ENFIA Agreement set out a formula to determine the monthly charge for each ENFIA line used by OCCs to connect their long distance terminals with local telephone companies' central offices to provide MTS/WATS-type services to local telephone company customers who also subscribe to the OCCs' service. This formula, which "is patterned after the method by which local telephone companies are ... compensated for use of exchange facilities for traditional interstate MTS and WATS services," Acceptance Order, 71 F.C.C.2d at 444-45, consists of three elements:[8]
 
 
 23
 (1) A charge, determined by reference to local carrier tariffs, for a line between an OCC switch and a local exchange switch.
 
 
 24
 (2) A charge for the traffic sensitive portion of local exchange costs associated with the provision of OCC services. This charge turns primarily on the OCCs' billed minutes of use per month per ENFIA line ("MOUs").
 
 
 25
 (3) A charge for the non-traffic sensitive portion of local exchange costs associated with the provision of OCC services. This element, which accounts for the large majority of the ENFIA rate, is derived by multiplying MOUs reported by the OCCs by a subscriber plant cost-per-minute variable known as the "Separations Amount," and then discounting the product according to the applicable "Factor P."[9] Factor P originally was set at thirty-five percent, but the parties agreed that the discount would be reduced and this percentage would rise as the OCCs' business increased during the first three years of the term of the ENFIA Agreement. If the FCC determined that the ENFIA Agreement should enter Phase II, it also was required to establish an appropriate level for Factor P.
 
 3. The Acceptance Order
 
 26
 Pursuant to the terms of their contract, the signatories sought the FCC's approval of the ENFIA Agreement and a tariff "intended to reflect the agreement reached [therein] among the parties as to an acceptable compromise for the Interim Period." ENFIA Agreement p 6, reprinted in 43 Fed.Reg. at 59,131. In so doing, they expressed their belief that the interim agreement would "serve the public interest," id. p 2, reprinted in 43 Fed.Reg. at 59,130, but the FCC properly recognized that its inquiry could not be "limited to these parties' individual interests ... [and that the agency was] obligated to assess the public interest as it might be affected by the agreement." Acceptance Order, 71 F.C.C.2d at 441; see id. at 451. But the agreement of the carriers, the FCC believed, did allow it to avoid the "rigor [of a full public interest determination] necessary to support FCC prescription" of just and reasonable rates. Id. at 453; see 47 U.S.C. § 205(a) (1976). The public interest, the Commission stated, could not be assessed "with mathematical precision" on the basis of existing data, but would be served by avoiding "protracted litigation" and creating "some degree of certainty" in this uncharted field. Acceptance Order, 71 F.C.C.2d at 451.
 
 
 27
 In a decision it later characterized as "an interim arrangement to carry out the mandate of the Execunet decisions and establish a workable modus vivendi among all parties [229 U.S.App.D.C. 212] until the many difficult, complex, and fundamental issues presented by the advent of competition had been resolved," Order After Investigation, 91 F.C.C.2d at 1083, the FCC approved and accepted the ENFIA Agreement. The Commission acknowledged that "[t]he interim agreement is not represented as cost-based in toto." Acceptance Order, 71 F.C.C.2d at 453. But, "confronted with a choice between approving the agreement or conducting protracted proceedings to determine the lawfulness of an alternative AT & T ENFIA tariff that included substantially higher charges," the FCC concluded that the latter course of action "would waste Commission and carrier resources because any ENFIA tariff would be superseded either by access charges to be established in ... [Docket 78-72 ] or access charges established pursuant to legislation that was being actively considered in both houses of Congress." Extension Order, 90 F.C.C.2d at 10. The ENFIA Agreement, moreover, appeared to embody "an acceptable compromise between the [local] business rate and a rate based upon unadjusted separations costs." Order After Investigation, 91 F.C.C.2d at 1083. These factors led the Commission to
 
 
 28
 approve the negotiation process and the agreement ... as being a reasonable means of avoiding complex and protracted litigation ..., as conducive to the ends of justice, and therefore, at least for the interim, as in the public interest.... [T]he settlement affords an expeditious and acceptable compromise of differences on matters relating to methodologies, rate levels and rate components which would otherwise necessitate substantial time, expense and effort to resolve through formal Commission processes (and likely appellate review).
 
 
 29
 Acceptance Order, 71 F.C.C.2d at 456 (emphasis added).
 
 4. Events Preceding the Challenging Orders
 
 30
 The ENFIA Agreement apparently worked satisfactorily during Phase I, which was scheduled to expire early in 1982 unless the agreed tariff was extended by action of the FCC. As the end of Phase I approached, MCI renewed its claim of discrimination with respect to the rates paid by other AT & T customers for the same type of local exchange access provided to MCI.[10] To prepare for the possibility that the ENFIA Agreement would not be extended, AT & T filed, in January 1982, a new contingent tariff ("BSOC 10") for the OCC access service that the Bell Operating Companies had been providing under the ENFIA Agreement. This tariff was scheduled to take effect on April 16, 1982 if the FCC failed to continue the ENFIA Agreement. Because of the interrelationship between the issues raised by BSOC 10 and the continuation question, the FCC called for simultaneous pleadings on both matters and established a filing schedule designed to enable it to act on these matters by April 16, 1982.
 
 B. The Challenged Orders of the FCC
 1. The Extension Order
 
 31
 The FCC's Extension Order, which continued the ENFIA Agreement into Phase II and determined a value for Factor P of fifty-five percent, was issued on April 14, 1982. The ENFIA Agreement, the FCC observed, conditioned such a decision on the Commission's determination that extension was in the public interest. Under the FCC's interpretation of the ENFIA Agreement, "[t]his question relates to the usefulness of the agreement and the formula it establishes as an interim mechanism for the determination of certain access costs pending a more permanent resolution of the access charge issue for all interstate services." Extension Order, 90 F.C.C.2d at 9; see Acceptance Order, 71 F.C.C.2d at 447.
 
 
 32
 Some of the OCCs argued that the ENFIA Agreement should not be extended because it is not cost-based. But the FCC determined, on the basis of "essentially the same considerations which led [it] to conclude that the public interest would be served by approving the original agreement," [229 U.S.App.D.C. 213] Extension Order, 90 F.C.C.2d at 10, that extension would promote the public interest. An investigation of BSOC 10, the Commission believed, would be wasteful, and an attempt to cure the lack of parity among interstate services before the conclusion of Docket 78-72 would "prejudge the result of that proceeding" and "occasion needless dislocations in the marketplace." Id. at 11. In the FCC's view, "[a]t this stage, the public interest is best served by an extension of an arrangement that was originally sanctioned by the parties themselves and that provides a reasonable interim solution to a very complex problem." Id.
 
 
 33
 After reaching this conclusion, the FCC turned to a determination of the level of payment for Phase II. It first acknowledged its obligation to ensure that "the charges are reasonable, for both OCCs and local carriers, and that they are nondiscriminatory to the extent that discrimination is discerned and found unjustified." Id. at 14. But, the Commission continued, "the question before us in this particular action is a narrow one. Under the terms of both the original agreement and ... the implementing tariff, the Commission is obliged to determine only the level of Factor P ...." Id. (footnote omitted). A fifty-five percent discount level, the FCC concluded, would maintain a reasonable balance between the parties, but the Commission made no attempt explicitly to determine that either the fifty-five percent level or the ultimate rate produced by the ENFIA formula was in the public interest.
 
 2. The Suspension Order
 
 34
 The Extension Order left open for determination the MOUs and Separations Amount variables necessary to compute the monthly charge per ENFIA line under the ENFIA Agreement. AT & T immediately filed tariff revisions addressing these variables on behalf of the Bell Operating Companies. These revisions proposed to increase the Separations Amount from $.0595 to $.0658 per minute and the MOUs from 3000 to 5823; the combined rate for Elements 2 and 3 under the proposal would have risen from $122.20 to $258.21 per month. Suspension Order, 90 F.C.C.2d at 205. The OCCs challenged both AT & T's estimation of their MOUs and its determination of the Separations Amount.
 
 
 35
 On April 30, 1982, the FCC issued an order suspending the tariff revisions for five months and setting for investigation the proper level of MOUs and the correct Separations Amount. To avoid any disruption of service and to protect the parties' rights during the investigation, the Commission exercised its authority under section 4(i) of the Communications Act, 47 U.S.C. § 154(i) (1976), to impose an interim billing and collection rate based on 4000 MOUs and the Separations Amount proposed by AT & T. This rate, $178.46 per line per month, was made subject to adjustment at the termination of the FCC's investigation.
 
 3. The Order After Investigation
 
 36
 In its Order After Investigation, issued on September 29, 1982, the FCC expressly recognized its obligation to ensure that AT & T's tariff revisions "conform to the terms of the ENFIA agreement and do not undermine [its] finding that the agreement is reasonable and in the public interest." Order After Investigation, 91 F.C.C.2d at 1086. Applying this standard, the Commission rejected AT & T's proposed rate increases and directed AT & T to file a replacement tariff "using a [Separations] Amount no higher than $.0595, a billed minute factor no higher than 4474, and an overall Element 2 and 3 rate no higher than $183.46." Id. at 1093.[11]
 
 
 37
 These conclusions rested largely on the FCC's interpretation of the ENFIA Agreement. After noting the ambiguity of certain contract terms and the disagreements among the parties concerning how those [229 U.S.App.D.C. 214] terms should be applied to the changed circumstances of the OCC industry, the FCC endeavored to "apply the agreement in a manner consistent with the intent of the parties." Id. at 1086. In the Commission's view,
 
 
 38
 [t]he parties intended that ENFIA rates would reflect a compromise between rates based upon the full cost assigned to interstate jurisdiction ... and the rates for local service ... which the OCCs had been paying. Put simply, the ENFIA agreement was a "rough justice" compromise intended to maintain a reasonable balance between the parties until Commission-prescribed access arrangements could be put into place.
 
 
 39
 Id.
 
 
 40
 With that background, the FCC made two determinations that are challenged in these proceedings. It held, first, that the OCCs' off-peak MOUs should be discounted by the same percentage as AT & T's off-peak subscriber rates, and authorized a forty-percent evening discount and a sixty-percent discount for nighttime and weekend calls. The question of nonbusiness or off-peak minutes, the Commission believed, had not been contemplated when the ENFIA Agreement was negotiated because the OCCs had little or no business outside peak periods at that time. This lack of specific consideration, the Commission concluded, left it free reasonably to apply "the original intent of the parties to the altered characteristics of OCC services" by adopting a "middle-ground" approach between the OCCs' position that off-peak MOUs should not be counted at all and AT & T's position that all MOUs should be counted equally. Id. at 1091.
 
 
 41
 In its second challenged determination, the FCC held that AT & T's calculation of the Separations Amount "must be adjusted to reflect and accommodate [the Commission's] recent decision to freeze SPF at 1981 average levels, a development neither anticipated nor provided for under the [ENFIA] agreement." Id.; see note 4 supra. Although the Commission previously had rejected the OCCs' contention that the viability of the ENFIA Agreement had been vitiated by the SPF freeze, Extension Order, 90 F.C.C.2d at 11, it concluded that the freeze would deny the OCCs the benefit of a discount contemplated by the signatories. Implementing a corresponding freeze of the Separations Amount at the 1981 level of $.0595, the FCC held, would
 
 
 42
 maintain the proper status quo of interstate subscriber plant costs for the OCCs until new interstate allocative measures are put into effect, and will help prevent disruptive and inequitable rate increases to the OCCs in the remaining interval before the completion of the Commission's work ... [in Docket 78-72 ].
 
 
 43
 Order After Investigation, 91 F.C.C.2d at 1092. The Commission ultimately concluded that the rates produced by its interpretations of the disputed contract terms "should strike a reasonable balance as an interim measure." Id. at 1093.
 
 4. The Order on Reconsideration
 
 44
 Just before the oral argument in these cases, the FCC released its disposition of the petitions for reconsideration filed by AT & T, SBS, USTS, and SPCC. See AT & T, FCC 83-125 (Apr. 5, 1983) ("Order on Reconsideration" ).[12] SBS' petition, which objected to the imposition of the increased ENFIA rates on carriers that had not [229 U.S.App.D.C. 215] signed the ENFIA Agreement, was rejected on the grounds that the
 
 
 45
 agreement was an industry-wide arrangement negotiated to resolve an industry-wide conflict, and that, by its terms, the ENFIA tariff is applicable to any carrier that requires the use of local exchange facilities in the provision of end-to-end MTS/WATS-type interstate services.
 
 
 46
 Id. at 29 n. 65.[13] The USTS and SPCC petitions, which challenged the provision of the Order After Investigation requiring retroactive payments for the five-month suspension period, also were rejected on the ground that the two-way retroactive adjustment provision was "a necessary and suitable concomitant of the interim rate" that was fully authorized by section 4(i) of the Communications Act. Id. at 21. AT & T's petition, which argued that the FCC had erred in computing the off-peak discounts, was granted in part. As a result of the adjustments made in the Order on Reconsideration, the weighted average monthly OCC minutes per line were increased to 4555, and the overall Elements 2 and 3 rate rose to $186.72 per line per month. Id. at 19.[14]
 
 C. The FCC's Action in Docket 78-72
 
 47
 Not challenged in these proceedings, but nonetheless relevant to our evaluation of several issues raised herein, is the FCC's recent decision in MTS & WATS Market Structure, FCC 82-579 (Feb. 28, 1983), reprinted in 48 Fed.Reg. 10,319 (1983), appeal pending sub nom. National Association of Regulatory Utility Commissioners v. FCC, No. 83-1225 (D.C.Cir. filed Mar. 1, 1983) ("Third Report and Order" ). The Third Report and Order adopted a transitional access charge plan and required the submission of implementing tariffs designed to take effect on January 1, 1984. One of the factors underlying the new access plan was the FCC's conclusion that the existing access service compensation arrangement produced unlawfully discriminatory rates in violation of 47 U.S.C. § 202(a) (1976). Third Report and Order at 18-19, reprinted in 48 Fed.Reg. at 10,325-26. Although the decision purports to eliminate that discrimination prospectively, id. at 19 n. 20, reprinted in 48 Fed.Reg. at 10,326, the Commission did not consider the impact of its finding of discrimination on the rates in effect during the remaining months of the interim period.
 
 II. DISCUSSION
 
 48
 We consider, in turn, two types of challenges to the decisions of the FCC. The focal point of the first set is the Extension Order. The OCCs argue, alone or in combination, that the order was untimely, that it ignored the FCC's contractual and statutory obligations to determine that the negotiated formula would produce rates consistent with the public interest, and that the Commission failed to specify the Factor P discount in the manner contemplated by the ENFIA Agreement. We reject each of these contentions, but direct the FCC to conduct additional proceedings to consider certain remedial questions prompted by its resolution of the discrimination issue in Docket 78-72.
 
 
 49
 The second set of challenges concerns the Order After Investigation, as modified by the Order on Reconsideration. Based as they are on the FCC's reasonable interpretations of the ENFIA Agreement in light of its overriding public interest obligation and the changed circumstances in the industry, these challenges may be disposed of summarily.
 
 
 50
 A. Extension of the ENFIA Agreement.
 
 1. Timeliness of the Extension Order
 
 51
 By its terms, the ENFIA Agreement required the FCC to make its determination regarding extension "prior to the end of Phase I"; absent a timely Commission decision, the agreement was to "terminate at [229 U.S.App.D.C. 216] the end of Phase I." ENFIA Agreement p 11, reprinted in 43 Fed.Reg. at 59,131-32. Phase I, the parties specified, was to expire "three years from the effective date of [the] Agreement," id. p 10, reprinted in 43 Fed.Reg. at 59,131, a date that must be determined by reference to the date of "release of a Commission Order accepting and approving [the] Agreement," id. p 6, reprinted in 43 Fed.Reg. at 59,131. Although the parties executed the ENFIA Agreement on December 13, 1978, the FCC did not issue its Acceptance Order until April 16, 1979. Looking only to the terms of the ENFIA Agreement itself, then, one would conclude that the FCC's Extension Order, which was released on April 14, 1982, complied with the timetable negotiated by the parties, albeit by the barest of margins.
 
 
 52
 MCI correctly observes, however, that the provisions of the ENFIA Agreement itself do not constitute the only available evidence of the parties' intent. Notwithstanding the apparent clarity of the deadline for FCC action established by Paragraph 11 of the ENFIA Agreement, MCI urges that we look also to the terms of the Illustrative Tariff that accompanied the agreement. That tariff, unlike the agreement itself, specified an exact date by which the FCC was required to act to implement Phase II--a date that unfortunately did not coincide with the timetable promulgated in Paragraph 11. Under the terms of the original tariff, the FCC's extension decision was due by February 1, 1982: "In the event the FCC does not determine Factor P prior to February 1, 1982, this tariff and the rates and charges contained herein will expire on February 28, 1982." Illustrative Tariff 18, reprinted in J.A. 223. This discrepancy between the ENFIA Agreement and the tariff was eliminated in tariff amendments--filed by AT & T, served on all parties to the agreement and users of ENFIA service, and accepted by the FCC--that brought the deadline for FCC action specified by the tariff into line with the timetable established by Paragraph 11.[15]
 
 
 53
 MCI objects strenuously to the manner in which these amendments were filed, but we need not address its factually opaque challenge because we do not treat the amendments as dispositive. If the amendments conform to the parties' original intent, we view them as unnecessary to the Commission's authority to extend the ENFIA Agreement; if the amendments contravene the intent of the parties, they cannot justify the Commission's lateness despite their technical procedural correctness. See ENFIA Agreement p 17, reprinted in 43 Fed.Reg. at 59,132. In either case, the original intent of the signatories to the ENFIA Agreement will control our disposition, and it is to an analysis of that intent that we now turn.
 
 
 54
 Our conclusions regarding the parties' intent depend, of necessity, primarily on the weight we attribute to Paragraph 11 of the ENFIA Agreement and the deadline provision of the Illustrative Tariff. To the extent that both provisions can be given meaning, we must strive to do so. See, e.g., Washington Metropolitan Area Transit Authority v. Mergentime Corp., 626 F.2d 959, 961 (D.C.Cir.1980); Papago Tribal Utility Authority v. Federal Energy Regulatory Commission, 610 F.2d 914, 929 (D.C.Cir.1979). But, as we read the provisions, they are fundamentally inconsistent: Paragraph 11 conferred on the FCC authority that was to continue in existence until "the end of Phase I," while the original tariff provision purported to terminate that authority two-and-one-half months before Phase I was to expire. MCI's argument that Paragraph 11 and the tariff can be reconciled is thus unavailing.
 
 
 55
 It is necessary, therefore, to choose between the deadline established by Paragraph 11 and the one specified in the accompanying tariff. Under ordinary circumstances, this choice would be aided by the maxim that a specific contractual clause, if inconsistent with a more general clause, [229 U.S.App.D.C. 217] should be read as modifying or nullifying the general clause. 3 A. CORBIN, CONTRACTS § 547 (1960); see Mutual Life Insurance Co. v. Hill, 193 U.S. 551, 558, 24 S.Ct. 538, 540, 48 L.Ed. 788 (1904). In this case, however, it cannot be said that one of the relevant provisions is more specific than the other. Both Paragraph 11 and the Illustrative Tariff speak directly to the deadline for FCC action to implement Phase II. And, while it is true that the tariff specified a date certain on which the FCC's authority under the contract was to expire, the timetable that can be discerned by reading Paragraph 11 in light of Paragraphs 6, 10, and 19 is no less certain and no less specific.
 
 
 56
 Furthermore, strict adherence to the tariff provision alone would grossly distort the intent of the signatories of the ENFIA Agreement. Under the terms of the agreement, the provisions of the tariff were made subordinate to those of the contract itself. The tariff, after all, was not characterized as the primary embodiment of the parties' intent, but was "intended to reflect the agreement reached herein," i.e., in the ENFIA Agreement itself. ENFIA Agreement p 6, reprinted in 43 Fed.Reg. at 59,131 (emphasis added). And the propriety of tariff amendments, the parties provided, was to be judged by their faithfulness to the terms of the ENFIA Agreement itself and not by reference to any subsidiary manifestation of the parties' original intent. Id. p 17, reprinted in 43 Fed.Reg. at 59,132.
 
 
 57
 As a result, the most reasonable interpretation of the February 1, 1982 deadline set forth in the original tariff is one that characterizes it as merely illustrative. AT & T argued, and the FCC apparently agreed, that the tariff provision constituted an attempt to project the date of FCC approval of the ENFIA Agreement and thus the date the Commission's authority to implement Phase II would expire. Consistent with Paragraph 18 of the ENFIA Agreement, which looked for FCC approval within approximately sixty days of December 13, 1978, id. p 18, reprinted in 43 Fed.Reg. at 59,132, the dates in the Illustrative Tariff "were based on the assumption that the Agreement would be approved by the F.C.C. and, therefore, would be effective by March 1, 1979." AT & T Transmittal No. 46 (Nov. 10, 1981), reprinted in J.A. 333, 334. Since that assumption proved overly optimistic, the illustrative dates failed to coincide with the timetable established by the parties in Paragraph 11. But we have found no evidence that the parties intended the dates inserted in the Illustrative Tariff to prevail over the language of the ENFIA Agreement itself, and, accordingly, we conclude that the FCC's Extension Order was timely.[16]
 
 
 58
 2. The Public Interest Determination and the Discrimination Claims
 
 
 59
 As we have already made clear, the intercarrier negotiations in 1978 led to an interim settlement agreement that was submitted to, reviewed, and approved by the FCC as in the public interest. The Commission's Acceptance Order acknowledged its public interest obligation, Acceptance Order, 71 F.C.C.2d at 441, 451, and its determination that an interim agreement would serve the public interest represented a legitimate and unchallenged discharge of its statutory responsibility. It is important to bear in mind, however, the interim nature of the charges established by the negotiated settlement agreement. Nothing could be [229 U.S.App.D.C. 218] clearer than that the FCC and the parties understood that this interim arrangement was tendered and approved "pending" the resolution of a number of fundamental issues--including the claim of discrimination--in the Docket 78-72 rulemaking proceeding. See id. at 443-44, 453; ENFIA Agreement pp 1, 3, 6 n.*, reprinted in 43 Fed.Reg. at 59,130-31. The Commission did not turn a blind eye to these issues, but concluded instead that their resolution would "require evidence that presently simply does not exist." Acceptance Order, 71 F.C.C.2d at 453. It then responded to the pressing need for the expeditious establishment of interim ENFIA rates by approving the formula produced through arms-length bargaining among the affected parties.
 
 
 60
 No one challenged the manner in which the FCC ordered its priorities and dealt with the many complex issues before it in 1979, but several of the OCCs have argued that the Commission's similar decision last year ignored both the terms of the ENFIA Agreement and the requirements of the Communications Act.
 
 
 61
 a. The FCC's Obligations Under the ENFIA Agreement
 
 
 62
 Under the terms of the ENFIA Agreement, the negotiated settlement would expire at the end of Phase I unless "the FCC determines that it is reasonable and in the public interest to implement Phase II." ENFIA Agreement p 11, reprinted in 43 Fed.Reg. at 59,131-32. The accompanying tariff purported to require even more of the FCC; it provided that the Phase II rates would go into effect "if the FCC determines the rates are in the public interest." Illustrative Tariff 18, reprinted in J.A. 223. Several petitioners rely, in part, on this contractual language to support their claims that the FCC failed to make the determinations required in order properly to extend the ENFIA Agreement. The FCC, they argue, could not conclude that the implementation of Phase II would serve the public interest without first finding the rates established for that period by the negotiated formula to be just, reasonable, and nondiscriminatory. Were we to accept this enumeration of the duties imposed on the Commission by the signatories to the ENFIA Agreement, we would be forced to invalidate the Extension Order since it was not accompanied by pronouncements on the cost basis of the rates, the effect of the rates on competition, or the comparability of the contract rates and the charges imposed for like services.[17]
 
 
 63
 We have concluded, however, that the FCC's more limited conception of the contractually established conditions precedent to the implementation of Phase II should govern. As interpreted by the Commission in 1979, an extension decision could legitimately rest on a simple finding that "it is reasonable and in the public interest to continue the agreement." Acceptance Order, 71 F.C.C.2d at 447. This construction was reiterated in 1982, when the FCC declared that the contract required only an assessment of "the usefulness of the agreement and the formula it establishes as an interim mechanism ... pending a more [229 U.S.App.D.C. 219] permanent resolution of the access charge issue for all interstate services" in Docket 78-72. Extension Order, 90 F.C.C.2d at 9. The FCC's reasonable evaluation of the scope of the obligations imposed on it by the ENFIA Agreement is entitled to considerable deference,[18] and we have found no persuasive evidence that the parties intended a more painstaking examination of the public interest.[19]
 
 
 64
 The adequacy of the Commission's public interest determination under this interpretation of the ENFIA Agreement cannot be gainsaid. As the Commission found, the need for an interim rate had not yet been eliminated, the negotiated formula had proved to be an acceptable compromise for three years, no more satisfactory solution was available, and an attempt to establish an alternative interim rate system would have disrupted the market and undermined the comprehensive Docket 78-72 rulemaking proceeding. Extension Order, 90 F.C.C.2d at 9-13. The petitioners have made only perfunctory attempts to cast doubt on these findings, and we are convinced that the ENFIA Agreement continued to represent a useful interim mechanism, the need for which fully satisfied the contractually specified public interest standard.
 
 
 65
 This conclusion regarding the public interest determination required by the ENFIA Agreement does not fully exhaust the contract-based challenges to the Extension Order. MCI presses the independent claim that the ENFIA Agreement was based on the FCC's representations that it would act expeditiously to eliminate the discrimination between like services produced by the negotiated settlement, and that Phase II could not commence while that discrimination persisted. In support of this argument, MCI points to the parties' recommendation that the FCC should quickly resolve the discrimination issue, ENFIA Agreement p 5, reprinted in 43 Fed. at 59,131, and the Commission's commitment to study the matter, Acceptance Order, 71 F.C.C.2d at 444, 456-57.
 
 
 66
 We believe, however, that MCI's self-serving assertion that it would not have signed the ENFIA Agreement if it had known that Phase II might be implemented despite the pendency of the discrimination issue may properly be ignored.[20] Not only did the FCC make no express promise to resolve the discrimination issue within three years, but also it plainly stated, in discussing possible resolutions of the discrimination problem, that "[t]he parties' precatory language is ... not binding on us." Acceptance Order, 71 F.C.C.2d at 456 n. 30. MCI's unilateral hopes or expectations cannot limit the Commission's discretion to order the proceedings before it in the manner it deems most conducive to the effective discharge of its responsibilities.[21] As a result, [229 U.S.App.D.C. 220] MCI's discrimination argument, like the contract-based public interest claims advanced by its fellow OCCs, must be rejected.
 
 
 67
 b. The FCC's Statutory Obligations
 
 
 68
 Although the ENFIA Agreement did not, by its terms, require a determination that the Phase II rates were just, reasonable, and nondiscriminatory, the FCC also must conform to its governing statute. The Communications Act, several of the OCCs argue, imposes on the Commission the obligation to ensure that charges for common carrier services are nondiscriminatory and otherwise just and reasonable, whether those rates are established by tariff or by contract. See 47 U.S.C. §§ 201(b), 202(a) (1976). AT & T, on the other hand, argues that the only statutory requirement governing intercarrier rate agreements is that they be filed with the FCC, 47 U.S.C. § 211(a) (1976), and that there exists no affirmative requirement that agreed rates be shown, like unilateral carrier-initiated rates, to be just, reasonable, and nondiscriminatory.
 
 
 69
 The powers and obligations of the FCC with respect to intercarrier rate agreements have never been authoritatively determined. Sections 201(b) and 202(a) of the Communications Act appear, on their faces, to be fully applicable to rates established by contracts among carriers subject to the Act.[22] But "there is no provision in the ... Act expressly authorizing the Commission to regulate (i.e. supervise in the public interest) privately negotiated contracts."[23] Notwithstanding this lack of express authority, the FCC has consistently taken the position that section 211(a), which requires the filing of intercarrier contracts, contemplates Commission supervision of such contracts and "implicity authorizes [the FCC] to modify or abrogate carrier-to-carrier contracts as [it] find[s] is consistent with the public interest."[24] In Bell System Tariff Offerings,[25] for example, the Commission noted that,
 
 
 70
 [w]hile Section 211(a) does not specifically invest regulatory authority over ... contracts, it is reasonable to conclude that the provision which requires ... contracts to be filed confers upon the Commission the authority to determine whether the terms and conditions thereof are consistent with the provisions of the Act.
 
 
 71
 46 F.C.C.2d at 431. Under any other reading, "the filing requirement would be a meaningless exercise."[26] Indeed, after reviewing a number of other provisions of the Act, the FCC held that it was not only authorized, but obligated, "to determine the propriety of the terms and rates of ... [229 U.S.App.D.C. 221] contracts as well as those of ... tariffs." 46 F.C.C.2d at 435.
 
 
 72
 Our research has revealed no authority--in the Communications Act, its legislative history, or in notions of sound public policy--at odds with the FCC's previous assessments of its statutory powers and obligations, but we need not finally resolve the issue to decide this case. We assume, without deciding, that the FCC is both authorized and required to adjudicate challenges to the justness, reasonableness, and nondiscriminatory nature of contractually established rate structures. We need not hold as much since we deal here, not with a run-of-the-mill intercarrier contract, but with a settlement agreement drafted by parties to an ongoing tariff proceeding and approved by the Commission in order to terminate that proceeding and facilitate the comprehensive inquiry undertaken in Docket 78-72.[27] Unlike an ordinary intercarrier contract, this settlement agreement could neither take effect nor be extended absent an exercise of the FCC's statutory authority. To hold that the Commission could breathe life into such an agreement, and conclude its own statutorily required proceeding, in the face of patent unjustness, unreasonableness, or discrimination, would be to flout the mandates of the Communications Act.
 
 
 73
 We hold, therefore, that the FCC could not ignore the OCCs' statutory challenges to the interim rate structure when deciding whether to extend the ENFIA Agreement. But, while the FCC cannot continue in effect charges--established by tariff or by contract--it has determined to be unlawful, rates not yet found to be either just, reasonable, and nondiscriminatory or unjust, unreasonable, or discriminatory "can avoid the stigma of unlawfulness," at least during a reasonable interim period in which the FCC is attempting to establish a more permanent rate structure. MCI Telecommunications Corp. v. FCC, 627 F.2d 322, 338 (D.C.Cir.1980).
 
 
 74
 When applied to the Extension Order, these principles compel a decision upholding the FCC's action. We defer to the Commission's judgment that it lacked the data necessary to prescribe just and reasonable rates, and we find that the Commission permissibly exercised its discretion to order its own proceedings, see note 21 supra, in deferring the discrimination question to the Docket 78-72 rulemaking proceeding.[28] While we do not sanction any undue delay in the resolution of the critical issues underlying the ENFIA rates, neither do we find that the FCC acted improperly in tolerating the agreed upon delay experienced in this case.
 
 
 75
 In the context of tariff revisions, we recently indicated that the delay between the filing of revisions by a carrier and the FCC's final decision should be judged under a "rule of reason," and that the "standard of 'just and reasonable' rates is subverted when the delay continues for several years." MCI Telecommunications Corp., 627 F.2d at 340. In short, "[t]he best must not become the enemy of the good, as it does when the FCC delays making any determination while pursuing the perfect tariff." Id. at 341-42. Here, however, the parties and the FCC clearly anticipated from the outset that resolution of the fundamental and complex questions under consideration in Docket 78-72 might take as long as five years. That investigation was proceeding apace and nearing its end when the extension issue was presented to the FCC early in 1982. The Commission, moreover, did not "delay[ ] making any determination," but affirmatively decided to continue in effect a [229 U.S.App.D.C. 222] "good" interim solution rather than to undermine the inquiry designed to establish a more "perfect" rate structure. Under the unique circumstances of this case, that decision did not contravene the Communications Act.[29]
 
 
 76
 c. The Impact of Docket 78-72.
 
 
 77
 As the parties to the ENFIA Agreement and the FCC contemplated, many of the fundamental issues concerning the propriety of the ENFIA rate structure have now been resolved. In particular, the FCC has concluded that "the existing combination of access service compensation arrangements violates Section 202(a) of the Communications Act." Third Report and Order at 19 (footnote omitted), reprinted in 48 Fed.Reg. at 10,326. With respect to the ENFIA rates, the Commission has found:
 
 
 78
 The level of the ENFIA charge has been negotiated to reflect a discount from the MTS access compensation. It was also designed to produce a rate that is higher than the local exchange rate paid by FX and CCSA customers. Since no one has attempted to justify the disparate rates charged for like access services in this proceeding, we must find them to be unlawfully discriminatory.
 
 
 79
 Id. This discrimination problem, the FCC has noted, "could not be solved by maintaining the status quo," id. at 32, reprinted in 48 Fed.Reg. at 10,331; accordingly, the Third Report and Order lays the groundwork for a new access charge system designed to eliminate, on a prospective basis, all unjust and unreasonable discrimination among interstate services.
 
 
 80
 Although the Third Report and Order finds discriminatory the entire existing access system, the FCC did not make specific findings concerning the extent to which any of the petitioners were victimized by that discrimination. Counsel for the FCC made clear, moreover, that the Order itself will provide no retrospective cure for the unlawful discrimination the Commission found to exist, Transcript 52, and suggested that "the finding of discrimination ... is not one that necessarily impugns the validity of the settlement agreement as an interim procedure for dealing with a difficult problem," id. at 55. Counsel went so far as to argue, in fact, that "the Commission has the authority in framing a remedy for ... discrimination ... to confine itself to ... prospective [relief]." Id. at 64.
 
 
 81
 These statements, we believe, represent an overly generous view of the Commission's authority. We have been pointed to nothing in the Communications Act that empowers the Commission to forgive proven violations of the Act's clear prohibitions of unjust, unreasonable, and discriminatory rates. See 47 U.S.C. §§ 206, 209 (1976). And the FCC has expressly acknowledged that challenges to the ENFIA rates in complaint proceedings would be appropriate. Order on Reconsideration at 29 n. 65. Under the unique circumstances of this case, however, this concession from the FCC falls short of according the petitioners a determination to which they are entitled within the scope of this proceeding. The Commission has gone to great lengths to emphasize the interim nature of the rates it approved for Phase II. Now that those interim rates have been found to be part and parcel of an unlawfully discriminatory rate structure, the Commission is obligated to consider whether the petitioners are entitled to retroactive relief. That determination, moreover, must be made on remand in this case, and may not be relegated to independent complaint proceedings. The Commission's approval of the interim ENFIA rates has always been "subject to further proceedings"; indeed, the FCC stated at the outset that, during the term of the ENFIA Agreement, "this proceeding shall remain open" and the agreement itself is "subject to further Commission order." Acceptance Order, 71 F.C.C.2d at 458-59 (emphasis in original).
 
 
 82
 [229 U.S.App.D.C. 223] For the petitioners who were parties to the ENFIA Agreement, the prospect of such further proceedings appears singularly uncomforting. Not only did those petitioners agree to pay the rates established by the contractual formula, but also the signatories promised to refrain from attacking or challenging the lawfulness of those rates. ENFIA Agreement p 3, reprinted in 43 Fed.Reg. at 59,130. In the oral argument before this court, counsel for the FCC took the position that the signatories had thus waived their rights to retrospective relief. Transcript 52. In positing that refunds would be appropriate only if the ENFIA Agreement had expired,[30] MCI appears to concede the validity of this construction of the contract. On remand, the FCC should consider whether the signatories waived their rights to relief for discriminatory charges produced by the application of the ENFIA Agreement. If not, the Commission also should determine and award the appropriate relief.
 
 
 83
 The situation of the nonsignatories is markedly different. We reject their contention that the FCC could not lawfully apply the rates established by the ENFIA Agreement to carriers who were not parties to the agreement. By its terms, the ENFIA Agreement was intended to produce a generally applicable interim rate; the FCC accepted it as such and properly concluded that the public interest would be served by the continued application of the interim arrangement to all of the OCCs. But, while the nonsignatories were properly subjected to the ENFIA rates on an interim basis, they are not bound by the terms of the ENFIA Agreement itself and have not waived their rights to relief from the discrimination the Commission has found to exist. Since the nonsignatories never agreed to be bound by the interim arrangement, the FCC must have contemplated that a determination in Docket 78-72 that the negotiated rates were unjust, unreasonable, or discriminatory would be followed by a refund order.[31] On remand, therefore, the FCC must evaluate the rates paid by the nonsignatories during the interim period in light of the finding of system-wide discrimination in Docket 78-72 and order appropriate relief.[32]
 
 
 84
 Our resolution of this issue, we emphasize, is a limited one confined to the unique circumstances of this case, circumstances that we hope will never be duplicated. We express no view on the question whether provisions for retroactive adjustments are inherent in the very concept of interim rates, and we caution that our opinion should not be read as embracing any such general proposition.
 
 
 85
 3. The Specification of "Factor P"
 
 
 86
 The final challenge to the FCC's Extension Order concerns the manner in which the Commission established the Factor P discount to be used in computing Element 3 of the ENFIA rate for Phase II. By their terms, the ENFIA Agreement and the Illustrative Tariff required, respectively, only that the Commission "determine" or "specify" an appropriate Factor P.[33] Neither the agreement nor the tariff indicated how the necessary determination was to be made, but MCI attempts to find support in the Acceptance Order for the proposition that the FCC's decision must satisfy the statutory requisites for a "prescription" under section [229 U.S.App.D.C. 224] 205(a) of the Communications Act.[34] Because it did not conform to those statutory requirements, the argument goes, the Extension Order was unlawful.
 
 
 87
 The language of the Acceptance Order is admittedly somewhat ambiguous. The Commission referred, at one point, to the requirement that it "specify[ ] ... [Factor P] for the remaining two years." Acceptance Order, 71 F.C.C.2d at 446. But it later suggested both that the ENFIA Agreement required it to "prescribe an appropriate level for payment above specifically identifiable costs," id. at 447, and that "any such prescription proceeding is likely to be lengthy," id. at 456. The use of these statutory terms of art, MCI argues, evinces the Commission's contemporaneous understanding that the parties intended a comprehensive section 205(a) inquiry. The contention, while plausible, ultimately must be rejected.
 
 
 88
 The FCC's contemporaneous interpretation of the settlement agreement, we have already indicated, is of central importance. See note 18 supra. But the Commission never referred to section 205(a), and its reference to the possible length of the proceeding necessary to determine Factor P easily could be taken as a simple acknowledgement of the parties' notorious capacity to disagree. There is, therefore, no evidence that the Commission's choice of language reflected its view that the ENFIA Agreement required a statutory rate prescription under section 205(a). In view of the parties' total lack of reference to the statutory requirements in either the ENFIA Agreement or the Illustrative Tariff, we conclude that the FCC used the word "prescribe" as no more than a colloquial synonym for "determine" or "specify," and we hold that its determination of Factor P fully comported with the parties' intent.
 
 B. Interpretation of the ENFIA Agreement
 
 89
 Having determined that the FCC properly extended the interim rate structure, we must now consider whether it interpreted the ENFIA Agreement consistently with the parties' intent in setting the rate levels for Phase II.[35] According to AT & T, the Commission's Order After Investigation, which purported merely to interpret the ENFIA Agreement, unjustifiably departed from its terms and the parties' intent in two important respects. Relying on our recent decision in MCI Telecommunications Corp. v. FCC, 665 F.2d 1300 (D.C.Cir.1981), AT & T asks us to set aside both the Commission's decision to reduce the OCCs' minutes-of-use by discounting off-peak usage of local exchange facilities and its adjustment of the Separations Amount used to compute Element 3 of the ENFIA rate.
 
 
 90
 Our earlier decision, however, held only that the FCC could not permit a carrier unilaterally to abrogate or modify an agreement by filing tariffs altering the terms of the agreement. 665 F.2d at 1302-03. That rule has no application in this case, for the Commission did not abrogate, set aside, or modify the ENFIA Agreement, but rather construed it. "Of course, opinions may differ as to the proper limits and results of construction. But where, as here, the meaning of contractual provisions is contested and unclear, we have no hesitancy in characterizing the process as construction." Western Union Telegraph Co. v. FCC, 541 F.2d 346, 354 (3d Cir.1976), cert. denied, 429 U.S. 1092, 97 S.Ct. 1104, 51 L.Ed.2d 538 (1977). The Commission's constructions of the disputed contract terms, [229 U.S.App.D.C. 225] we believe, were reasonable and necessary to ensure that Phase II was implemented in a manner consistent with the language of the ENFIA Agreement, the parties' intent, and the public interest. Accordingly, we reject each of AT & T's challenges to the Commission's Order After Investigation.[36]
 
 III. CONCLUSION
 
 91
 Although we have not attempted to discuss every single argument advanced by all of the many parties to this proceeding, we have carefully considered and rejected those not specifically addressed herein. For the reasons set forth above, we affirm each of the challenged orders of the FCC except to the extent they are inconsistent with Part II.A.2.c. of this opinion. We remand the case for the limited purpose of considering the propriety of and, if appropriate, awarding retroactive refunds and prospective relief to OCCs that were victimized by the system-wide discrimination found to exist in Docket 78-72 and that have not waived their legal right to such remedies.
 
 
 92
 So ordered.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 294(d) (Supp. V 1981)
 
 
 [1]
 See Bell Sys. Tariff Offerings, 46 F.C.C.2d 413, aff'd sub nom. Bell Tel. Co. v. FCC, 503 F.2d 1250 (3d Cir.1974), cert. denied, 422 U.S. 1026, 95 S.Ct. 2620, 45 L.Ed.2d 684 (1975); Specialized Common Carrier Servs., 29 F.C.C.2d 870 (1971), aff'd sub nom. Washington Utils. & Transp. Comm'n v. FCC, 513 F.2d 1142 (9th Cir.), cert. denied, 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54 (1975)
 
 
 [2]
 MCI Telecommunications Corp., 60 F.C.C.2d 25 (1976), rev'd, 561 F.2d 365 (D.C.Cir.1977), cert. denied, 434 U.S. 1040, 98 S.Ct. 781, 54 L.Ed.2d 790 (1978)
 
 
 [3]
 AT & T, 67 F.C.C.2d 1455 (1978)
 
 
 [4]
 47 C.F.R. § 67.1 (1982). Interstate MTS and WATS revenues are allocated among AT & T and the Bell and Independent Operating Companies
 in accordance with a formula which enables each participating carrier to recover its operating costs that are allocable to ... interstate calls plus a portion of the remaining revenues which provides the carrier's return element and which is based upon its share of the total investment of all carriers providing interstate service.
 MTS & WATS Mkt. Structure, 77 F.C.C.2d 224, 227 (1980). The allocation of costs between interstate and intrastate jurisdictions is accomplished by means of the Subscriber Plant Factor ("SPF"), a variable that weights interstate minutes of use more heavily than intrastate minutes. By 1981, "SPF ha[d] the effect of assigning to the interstate jurisdiction approximately 3.3 times the actual number of interstate message minutes of use." Hawaiian Tel. Co., 87 F.C.C.2d 864, 868 (1981). Thus, while approximately eight percent of telephone use in 1981 was for interstate calls, approximately 26% of the local subscriber plant costs was allocated to interstate message services. In February 1982, the FCC froze SPF at the 1981 level. Amendment of Part 67 of the Commission's Rules & Establishment of a Joint Bd., 89 F.C.C.2d 1 (1982), petition for review pending sub nom. MCI Telecommunications Corp. v. FCC, No. 82-1237 (D.C.Cir. filed Mar. 4, 1982).
 
 
 [5]
 For a summary of evidence calling into question this analogy, see United States v. AT & T, 524 F.Supp. 1336, 1356-57 & n. 90 (D.D.C.1981)
 
 
 [6]
 The actual signatory was USTS' corporate predecessor, ITT Corporate Communications Services, Inc
 Satellite Business Systems, Inc. ("SBS") participated in the negotiations as an observer, but did not sign the ENFIA Agreement.
 
 
 [7]
 Letter from Henry Geller, Assistant Secretary of Commerce for Communications and Information, to Lawrence Darby, Chief, FCC Common Carrier Bureau (Oct. 17, 1978), reprinted in Joint Appendix ("J.A.") 161, 162. See also Letter from William Stump, Assistant Vice President, AT & T, to David Irwin, FCC Common Carrier Bureau (Oct. 10, 1978), reprinted in J.A. 146
 
 
 [8]
 ENFIA Agreement pp 8-10, reprinted in 43 Fed.Reg. at 59,131; see Suspension Order, 90 F.C.C.2d at 204
 
 
 [9]
 The formula for Rate Element 3 can be paraphrased as follows: Compensation for Use of Jointly Used Subscriber Plant = MOUs X Separations Amount X Factor P X 1.1015. Illustrative Tariff 17-19, reprinted in J.A. 202, 222-24. The 1.015 factor is designed to offset the higher costs per minute incurred by some independent telephone companies whose charges are collected by the Bell Operating Companies
 
 
 [10]
 See Complaint of MCI Telecommunications Corp. (Dec. 17, 1981), reprinted in J.A. 339
 
 
 [11]
 Pursuant to the retroactive adjustment provision of the Suspension Order, the FCC ordered the OCCs to remit the difference between the interim rate of $178.46 and $183.46. Order After Investigation, 91 F.C.C.2d at 1093-94
 
 
 [12]
 Accordingly, we reject SPCC's argument that the entire case is not ripe for judicial review because the administrative process is incomplete. We also reject MCI's contention that AT & T's failure to seek reconsideration of the FCC's computation of the off-peak discount before requesting judicial review requires the dismissal of its petition for review. The computational point was a minor one in the petition to this court and was not even presented as an issue for review in AT & T's brief. Finally, we reject the contentions of MCI and SPCC that AT & T's filing of a petition for reconsideration after seeking judicial review requires the dismissal of its petition for judicial review. A fair reading of the two petitions indicates that they were addressed largely to different aspects of the FCC's decision. Under the facts of this case, and in the absence of any evidence that this court and the FCC were acting at cross-purposes, it was sufficient to hold the record open for supplementation and to allow the proceedings to run their courses simultaneously
 
 
 [13]
 The FCC has "not foreclosed non-signatories, such as SBS, from arguing in complaint procedures that the ENFIA rates as applied to them are unreasonable or otherwise unlawful." Id.; see AT & T, 91 F.C.C.2d 568, 575 n. 12 (1982)
 
 
 [14]
 This rate was made retroactive under the adjustment provision of the Suspension Order
 
 
 [15]
 See AT & T Transmittal No. 46 (Nov. 10, 1981), reprinted in J.A. 333; AT & T Transmittal No. 50 (Mar. 12, 1982), reprinted in J.A. 968
 
 
 [16]
 We are fully aware of the inclusion in the original tariff of a one-month gap between the date by which the FCC extension decision was due and the expiration of the tariff. Illustrative Tariff 18, reprinted in J.A. 223. This gap was retained in AT & T's first amendment to the tariff, see AT & T Transmittal No. 46 (Nov. 10, 1981), reprinted in J.A. 337, but was eliminated when the tariff was amended a second time, see AT & T Transmittal No. 50 (Mar. 12, 1982), reprinted in J.A. 971. While this gap could be taken as evidence that the parties contemplated that the deadline for an FCC extension decision would precede the termination of Phase I, we have already rejected the contention that the tariff altered the plain language of the ENFIA Agreement itself. It appears, moreover, that the one-month gap was included in the tariff for the convenience of the local telephone companies, which have not complained of its eventual elimination
 
 
 [17]
 The standards imposed on the FCC under this interpretation of the ENFIA Agreement would parallel the standards set forth in the Communications Act. Section 201(b) of the Act, 47 U.S.C. § 201(b) (1976), requires that all charges for communications services be "just and reasonable." This court has previously indicated that "[a] basic principle used to ensure that rates are 'just and reasonable' is that rates are determined on the basis of cost." MCI Telecommunications Corp. v. FCC, 675 F.2d 408, 410 (D.C.Cir.1982) (footnote omitted). We have declared, moreover, that "[c]ompetition is without a doubt a factor to be weighed in determining where the public interest lies." Hawaiian Tel. Co. v. FCC, 498 F.2d 771, 776 (D.C.Cir.1974) (footnote omitted). It is also beyond cavil that "[e]qual prices for like services is in itself a matter of public interest." American Trucking Ass'ns v. FCC, 377 F.2d 121, 130 (D.C.Cir.1966), cert. denied, 386 U.S. 943, 87 S.Ct. 973, 17 L.Ed.2d 874 (1967). This nondiscrimination principle, in fact, is codified in § 202(a) of the Act, 47 U.S.C. § 202(a) (1976), a provision that "embodies an absolute obligation to prevent such discrimination in the public interest regardless of the needs of particular users or other policy considerations." Western Union Int'l v. FCC, 568 F.2d 1012, 1018 (2d Cir.1977), cert. denied, 436 U.S. 944, 98 S.Ct. 2845, 56 L.Ed.2d 785 (1978)
 
 
 [18]
 Cf. Distrigas of Mass. Corp. v. Boston Gas Co., 693 F.2d 1113, 1118 (1st Cir.1982) (When interpreting a provision of a settlement agreement incorporated into a permanent tariff upon approval by the Federal Energy Regulatory Commission, "[t]he ultimate issue is not what [the] words mean in some abstract sense, but rather what FERC intended them to mean when it approved the [provision]. That question is obviously one as to which the agency has special insight, which would shed light on this nominally 'legal' question.")
 
 
 [19]
 While the Illustrative Tariff appears to have contemplated a somewhat different inquiry, we do not consider its single reference to the tariff "rates" persuasive evidence that the parties intended a full-scale public interest determination. We have already suggested that the terms of the tariff are subordinate to those of the ENFIA Agreement itself. We note further that if the parties to this lawsuit--so careful to protect their real and perceived rights at every step of this proceeding and others considering the same subject matter--had meant to require a determination that the Phase II rates were just and reasonable as a precondition to extension, they most likely would have said so with considerable clarity
 
 
 [20]
 Cf., e.g., United States v. Armour & Co., 402 U.S. 673, 682, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971) ("[T]he scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it.")
 
 
 [21]
 47 U.S.C. § 154(j) (1976); see FCC v. Schreiber, 381 U.S. 279, 289-90, 85 S.Ct. 1459, 1467, 14 L.Ed.2d 383 (1965); Western Union Tel. Co. v. FCC, 665 F.2d 1112, 1121 & n. 13 (D.C.Cir.1981); Nader v. FCC, 520 F.2d 182, 195-97, 199 (D.C.Cir.1975)
 
 
 [22]
 After declaring unlawful any "charge, practice, classification, or regulation that is unjust or unreasonable," § 201(b) appears expressly to provide a less stringent standard for contracts between common carriers subject to the Act and carriers not subject to the Act. 47 U.S.C. § 201(b) (1976). Although we have not fully considered the purpose of this proviso, it suggests that Congress contemplated that contracts between regulated carriers would be subject to the Act's "just and reasonable" standard. Section 202(a) prohibits unjust or unreasonable discrimination effected "by any means or device," 47 U.S.C. § 202(a) (1976), and "[a] contract is a 'device' within the meaning of the Act." Bell Sys. Tariff Offerings, 46 F.C.C.2d 413, 432, aff'd on other grounds sub nom. Bell Tel. Co. v. FCC, 503 F.2d 1250 (3d Cir.1974), cert. denied, 422 U.S. 1026, 95 S.Ct. 2620, 45 L.Ed.2d 684 (1975). While it might be possible to argue that discrimination provided for by contract is not "unjustified," at least as between the signatories to the contract, the language of the Act appears to contemplate scrutiny of contractually established charges to protect the interests of the public at large
 
 
 [23]
 Bell Tel. Co. v. FCC, 503 F.2d 1250, 1279 (3d Cir.1974) (emphasis in original), cert. denied, 422 U.S. 1026, 95 S.Ct. 2620, 45 L.Ed.2d 684 (1975); see Western Union Int'l v. FCC, 568 F.2d 1012, 1020 (2d Cir.1977), cert. denied, 436 U.S. 944, 98 S.Ct. 2845, 56 L.Ed.2d 785 (1978)
 
 
 [24]
 Interconnection Facilities Provided to Int'l Record Carriers, 63 F.C.C.2d 761, 767 (1977); see Southern Pac. Communications Co., 66 F.C.C.2d 199, 202 (1977)
 
 
 [25]
 46 F.C.C.2d 413, aff'd on other grounds sub nom. Bell Tel. Co. v. FCC, 503 F.2d 1250 (3d Cir.1974), cert. denied, 422 U.S. 1026, 95 S.Ct. 2620, 45 L.Ed.2d 684 (1975)
 
 
 [26]
 Interconnection Facilities Provided to Int'l Record Carriers, 63 F.C.C.2d 761, 766 (1977)
 
 
 [27]
 This distinction does not remove the ENFIA Agreement from the scope of the "Sierra-Mobile" doctrine. MCI Telecommunications Corp. v. FCC, 665 F.2d 1300, 1302-03 (D.C.Cir.1981). As a result, the FCC cannot permit the agreement's unilateral abrogation by the filing of tariffs inconsistent with its terms. See Federal Power Comm'n v. Sierra Pac. Power Co., 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956); United Gas Pipe Line Co. v. Mobile Gas Serv. Corp., 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956)
 
 
 [28]
 Cf. Bell System Tariff Offerings, 46 F.C.C.2d at 435 (acknowledging obligation to determine propriety of terms and rates established by contract, but deferring consideration of dispositive issues to separate proceeding)
 
 
 [29]
 Cf. MCI Telecommunications Corp. v. FCC, 675 F.2d 408, 413-16 (D.C.Cir.1982) (affirming FCC decision implementing interim cost allocation methodology, largely on basis of Commission's finding that no superior alternative was available)
 
 
 [30]
 Supplemental Brief for Petitioner MCI Pursuant to Local Rule 8(k) at 7-8
 
 
 [31]
 Cf. Order on Reconsideration at 25 (absent adjustment provisions, interim rate cannot constitute valid exercise of Commission's discretionary power; essential characteristic of interim rate "is that neither party is bound to the interim arrangement")
 
 
 [32]
 Where, as here, the fact that several petitioners were not parties to the governing intercarrier agreement can in no way be traced to conscious strategic decisions on their parts, the possibility that any remedy accorded them may itself involve discrimination between those petitioners and other carriers that have bargained away their rights to certain remedies does not seem particularly troublesome
 
 
 [33]
 ENFIA Agreement p 11, reprinted in 43 Fed.Reg. at 59,131-32; Illustrative Tariff 18, reprinted in J.A. 223
 
 
 [34]
 47 U.S.C. § 205(a) (1976). "The essential elements of a valid prescription order are a full opportunity to be heard and a finding that the action taken is just and reasonable." Nader v. FCC, 520 F.2d 182, 204 (D.C.Cir.1975) (footnote omitted); see AT & T v. FCC, 449 F.2d 439, 450-53 (2d Cir.1971)
 
 
 [35]
 MCI has indicated that it is unhappy with several aspects of the FCC's Order After Investigation and its Order on Reconsideration, but it has not seen fit to transform its general expressions of unhappiness into any meaningful and specific issues for review. Accordingly, we will ignore its various references to the Commission's interpretation of the ENFIA rate formula
 
 
 [36]
 AT & T's attacks on the methodology used by the FCC in computing the off-peak discounts were resolved in the Order on Reconsideration. We need not address them here